UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
ELAYNE R. MITCHELL,             )
                                )
        Plaintiff,              )
                                )
    v.                          )        Civil Action No. 01-1866 (RWR)
                                )
NATIONAL RAILROAD PASSENGER     )
    CORPORATION, et al.,        )
                                )
        Defendants.             )
_____ )

MEMORANDUM OPINION AND ORDER

Plaintiff Elayne Mitchell, formerly employed by defendant National Railroad Passenger Corporation ("Amtrak") in its human resources department, filed an amended complaint against Amtrak for race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq. (2000), and 42 U.S.C. § 1981 ("§ 1981")(Count I); age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621, et seq. (Count II); gender discrimination in violation of Title VII (Count III); perceived disability discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, et seq. (Count IV); and race, age, gender and perceived disability discrimination in violation of the D.C. Human Rights Act ("DCHRA"), D.C. Code Ann. §§ 2-1401.01, et seq. (2001)(Count V). Plaintiff also set forth claims against Amtrak management and

Case 1:01-cv-01866-RWR   Document 73   Filed 12/30/05   Page 2 of 77

- 2 -

supervisory employees Lorraine Green and Paula Porter for race

discrimination under § 1981 (Count I) and for sex, race, age and

perceived disability discrimination under the DCHRA (Count V).[1]

Defendants moved for summary judgment on all claims against

them.  Because plaintiff raises a genuine issue of material fact

regarding whether Amtrak's decision to terminate her and not to

hire her for a northeast corridor manager position was motivated

by her race or gender, Amtrak's motion will be denied as to

Counts I and III.  Accordingly, because defendants Green and

Porter participated in Amtrak's decision to terminate her

employment, their motion will be denied as to the termination

claim under §1981 in Count I.  Because defendants Green and

Porter played no role in Amtrak's decision not to hire her for

the manager position, their motion will be granted as to the

failure to hire claim under § 1981 in Count I.  Because plaintiff

has not demonstrated that age played any role in Amtrak's

decision to terminate her employment and to not hire her for the

_____

[1]     To the extent plaintiff also set forth claims against
Green and Porter under Title VII, Title VII does not provide for
liability against individual employees.  See Gary v. Long, 59
F.3d 1391, 1399 (D.C. Cir. 1995) (holding that an employer alone
is liable for a violation of Title VII by supervisory employees);
Martin v. Howard Univ., No. 99-1175, 1999 WL 1295339 (D.D.C. Dec.
16, 1999) (dismissing individually named defendants because
employer was solely liable for violations of Title VII).  Green
and Porter's motion to dismiss Title VII claims against them will
be granted.

- 3 -

manager position, or that Amtrak's proffered legitimate and
nondiscriminatory basis for its actions was a pretext for age
discrimination, Amtrak's motion will be granted as to Count II.
Because there are no material facts in dispute with regard to
certain elements of plaintiff's perceived disability claim, and
Amtrak is entitled to judgment as a matter of law on that claim,
Amtrak's motion will be granted as to Count IV.

Because plaintiff's race, age, gender and perceived
disability claims under the DCHRA are subject to virtually the
same legal analysis that governs Counts I through IV under
federal law, judgment will be granted to defendants on Count V
with respect to plaintiff's claims of age and perceived
disability discrimination, but Amtrak's motion will be denied on
plaintiff's race and gender discrimination claims in Count V.
Green and Porter's motion regarding plaintiff's race and gender
discrimination in termination claims in Count V will be denied as
the DCHRA, unlike Title VII, does subject Green and Porter to
individual liability.  However, because Green and Porter did not
participate in the hiring decision for the manager position,
judgment will be granted to them as to the failure to hire claims
in Count V.

- 4 -

**BACKGROUND**

## I.   PLAINTIFF'S EMPLOYMENT WITH AMTRAK

Plaintiff, an African-American female, worked in Amtrak's corporate Human Resources ("HR") Department in Washington, D.C. from January 1996 to January 2000.  (See Defs.' Stmt. Fact ¶¶ 1, 2, 22; Pl.'s Stmt. Fact ¶ 100.)  Amtrak hired plaintiff as a Human Resources Project Leader, and later changed her title to Human Resources Consultant.  (See Pl.'s Am. Compl. ¶ 9; Defs.' Ans. ¶ 9.)  Plaintiff worked in the HR Department's Workforce Development unit at the time Amtrak terminated her employment. (See Defs.' Stmt. Fact ¶¶ 12, 13.)

Defendant Paula Porter, an African-American female and the former Director of the Workforce Development unit in the HR Department,[2] interviewed plaintiff and recommended and sought approval for her hiring in 1996.  (See Decl. of Gerald T. Ford ("Ford Decl."), Ex. 7 at 24-26.)  Porter supervised plaintiff throughout her employment with Amtrak.  (See id., Ex. 5 at 37.) Defendant Lorraine Green is an African-American female and Vice-President of Amtrak's HR Department.  (See Defs.' Stmt. Fact ¶¶ 20-21.)  Porter was 48 years old, and Green was 54 years old,

---

[2]    Some time after plaintiff's termination, Porter assumed the position of Assistant Vice-President of the HR Department. (See Defs.' Stmt. Fact ¶ 16.)

at the time Amtrak terminated plaintiff's employment.   (See Pl.'s
Stmt. Fact ¶ 15; Defs.' Stmt. Fact ¶ 21.)

When Amtrak hired plaintiff in 1996, she represented to
Amtrak on her employee information form that her date of birth
was November 27, 1940.  (See Pl.'s Stmt. Fact ¶ 2; Ford Decl.,
Ex. 2 at A00118.)  Plaintiff's actual date of birth was
November 27, 1932.  (See Pl.'s Stmt. Fact ¶ 2; Decl. of Martha
Walfoort ("Walfoort Decl."), Ex. 1.)

During her employment, plaintiff "was responsible for
analyzing the educational and training needs of Amtrak's
employees, designing and implementing programs, and assessing
training programs for Amtrak's employees."  (Pl.'s Am. Compl.
¶ 9; see Defs.' Ans. ¶ 9.)  Plaintiff provided these services to
employees in Amtrak's three strategic business units ("SBUs") --
Northeast Corridor ("NEC"), Inter-City and West -- and "provided
training services to all Amtrak management employees . . ., which
included employees in the [SBUs] as well as corporate
headquarters."  (Defs.' Stmt. Fact ¶ 25; Pl.'s Stmt. Fact ¶ 25.)
When Amtrak management and supervisory employees required
leadership and supervisory development training, plaintiff was
responsible for delivering the training.  (See Defs.' Stmt. Fact
¶ 26; Pl.'s Stmt. Fact ¶ 26; Ford Decl., Ex. 7 at 92-93, Ex. 5 at
36-37 (plaintiff's deposition testimony that "[she] provided the

training throughout Amtrak for all of the training that fell
under the title of leadership development," and that she had such
a duty throughout her tenure), Ex. 23 at 405 (plaintiff's EEOC
affidavit in which she states, "[i]n 1999, . . . I led a company-
wide assessment of the skills gaps among front-line supervisory
personnel, and developed and managed the majority of the training
courses the HR Department used that year, including . . . all
leadership/supervisory courses").)

## II.  PAUL BELLO'S HIRING

In June 1998, Amtrak posted a job opening for an HR
Consultant (Management/Executive Education) position.  (See
Defs.' Reply at 11; Pl.'s Stmt. Fact ¶ 115; Ford Decl., Ex. 32.)
Porter testified in her deposition that as Amtrak got closer to
hiring someone for the position, Amtrak's "needs changed and
parts of [the June 1998 job posting] were no longer applicable."
(Walfoort Decl., Ex. 6 at 186.)  Amtrak asserts that plaintiff
never applied for the HR Consultant position posted in June 1998.
(See Defs.' Reply at 12.)

In May 1999, Porter selected Paul Bello, a 49-year-old white
male, to fill the vacant HR Consultant position and sought
approval from Lorraine Green.  (See Ford Decl., Ex. 33 and
Ex. 35; Walfoort Decl., Ex. 4 at 5.)  In seeking approval for
Bello's hiring, Porter noted that "[t]he position for which

[Bello] has been selected not only requires knowledge of training, but it is also critical that the successful candidate possess an understanding of explicit performance improvement systems." (Ford Decl., Ex. 33.) Among other skills, Porter specifically noted that Bello's hiring would bring to the Workforce Development unit "[e]xperience in the design and development of automated systems to measure and track key performance indicators" (id.), as well as "[i]ndepth knowledge of transactional delivery systems . . .." (Id.) Amtrak hired Bello as an HR Consultant in the Workforce Development unit on May 31, 1999. (See id., Ex. 34.)

## III. RESTRUCTURING THE WORKFORCE DEVELOPMENT UNIT

In 1998, Amtrak hired PricewaterhouseCoopers ("PWC") to assess its HR Department. (See Walfoort Decl., Ex. 26.) According to Amtrak, "[t]he objective of the assessment was to improve client services and establish a more efficient Human Resources Department." (Id., Ex. 25 at 4.)

In November 1999, Porter prepared a power point presentation entitled "Workforce Development: Framework for the Future State -- Amtrak Human Resources -- November, 1999." (Ford Decl., Ex. 7 at 115, Ex. 10.) In the power point presentation, Porter set forth multiple challenges facing the Workforce Development unit (see id., Ex. 10 at 1), as well as an analysis of the Workforce

Development unit.  (See id., Ex. 10 at 2.)  Plaintiff testified during her April 2002 deposition that the challenges identified by Porter in November 1999 had "been around . . . for a while" (Walfoort Decl., Ex. 7 at 74), and that Porter's analyses were accurate for both the Workforce Development unit and the HR Department as a whole.  (See id. at 76-77.)

Porter indicated in her power point presentation that the Workforce Development unit in November 1999 was "segmented/ disjointed, inefficient, costly" (Ford Decl., Ex. 10 at 2), and that "accountabilities [were] unclear leading to slow responsiveness, divergent priorities, and impeded service delivery[.]"  (Id.)  Porter's assessment was consistent with plaintiff's deposition testimony that the Workforce Development unit was "extremely competent in developing plans[,]" but was "not equally as competent in implementation of those plans, and subsequently the personnel in the [SBUs] were dissatisfied with our delivery."  (Id., Ex. 5 at 78.)  Plaintiff testified that the SBUs' dissatisfaction arose from the Workforce Development unit's failure to deliver on promises because some of the Workforce Development unit team members were not "matched skill[-]wise and competency[-]wise with some of the roles identified that some of the team members had to accomplish or were asked to accomplish." (Id. at 79.)

- 9 -

Porter recommended in the power point presentation
restructuring the Workforce Development unit by "eliminat[ing]
one position -- HR Consultant, Leadership/Supervisory training."
(Id., Ex. 10 at 8.)  Porter's presentation concluded, in part,
that the "[o]utsourcing of Leadership/Supervisory programs
[would] maximize/leverage internal resources, while expanding
developmental networks."  (Id.)  The proposed Workforce
Development unit organizational restructuring[3] eliminated the HR
Consultant position held by plaintiff.  (Compare id. at 4, with
id. at 7.)  According to Amtrak, its decision to outsource
plaintiff's position resulted from the PWC review.  (See Walfoort
Decl., Ex. 25 at 4.)

Porter testified in her April 2002 deposition that she made
a decision around November 1999 "that in order to become more
efficient and effective, [the Workforce Development unit was]
going to outsource leadership development training.  [The
Workforce Development unit was] going to focus greater attention
on analysis and tracking of training and forecasting for that

---

[3]    Porter's power point presentation also proposed
changing Bello's job title from HR Consultant to Senior Manager
(see Ford Decl., Ex. 10 at 4, 7), which was accomplished through
a reclassification in April 2000 "pursuant to [the] 1999
restructuring[.]"  (Walfoort Decl., Ex. 30.)  Bello's salary did
not change as a result of the reclassification.  (See Ford Decl.,
Ex. 34; Walfoort Decl., Ex. 30.)

- 10 -

training and providing greater support nationally." (Ford Decl., Ex. 7 at 113.) Porter testified that the decision to outsource leadership development training was based on a need to (1) "create a universal competency base" for Amtrak managerial employees; (2) "cover a diverse geographic area"; and (3) "become more responsive in the way that training was delivered." (Id. at 131.)

Porter testified that as a result of her decision to outsource leadership development training and eliminate plaintiff's position in the Workforce Development unit, she selected the American Management Association ("AMA") to provide leadership and supervisory training. (See id. at 133-34; see also id., Ex. 10 at 7 (Porter's power point presentation denoting that external contractors would be responsible for development and delivery of leadership and supervisory training programs).) Porter was familiar with the AMA and its training capabilities, having participated in AMA training programs "[t]hroughout [her] career, both at Amtrak and the bank." (Id., Ex. 7 at 134-35.)

Gerri Hall, an African-American female and Amtrak's Assistant Vice-President of Human Resources in January 2000,[4] approved Porter's recommendation to restructure the Workforce

---

[4]    In February 2001, Hall assumed the position of Vice-President of Business Diversity. (See Ford Decl., Ex. 8 at 21.)

- 11 -

Development unit and eliminate plaintiff's HR Consultant position.  (See Defs.' Stmt. Fact ¶ 42; Ford Decl., Ex. 7 at 115-116, Ex. 8 at 106-07.)  Hall was 40 years old at the time Amtrak terminated plaintiff's employment.  (See Defs.' Stmt. Fact ¶ 18.) After Hall approved Porter's recommendation, Green gave final approval to the proposal.  (See id. ¶ 43.)

Amtrak advised plaintiff by letter dated January 7, 2000 that the company was eliminating her position as an HR Consultant in the Workforce Development unit effective January 21, 2000. (See Ford Decl., Ex. 11 at 1.)  The letter advised plaintiff that she would receive, among other benefits, two weeks notice pay and four weeks severance pay if she did not sign a release agreement, or six weeks severance pay if she did sign a release agreement.[5] (See id. at 1, 2.)  The termination letter informed plaintiff that she had 45 days to consider whether to sign a release agreement (see id. at 2), and further provided that plaintiff could "apply for other Amtrak positions during [her] two-week notice period."  (Id. at 3.)  Plaintiff did not sign the release agreement offered by Amtrak.  (See id., Ex. 5 at 134.)  She also did not apply for any Amtrak positions during her two-week notice

---

[5]     By letter dated January 12, 2000, Amtrak revised its severance pay offer to plaintiff to reflect her eligibility for eight weeks severance pay with a signed release agreement.  (See Walfoort Decl., Ex. 8.)

period or at any time after Amtrak terminated her employment.
(See id. at 130, 134.)

## IV.  PLAINTIFF'S APPLICATION FOR THE NEC MANAGER POSITION

In October 1999, before Amtrak eliminated plaintiff's HR
Consultant position in January 2000, she applied for a position
with Amtrak as the Employee Services-NEC Manager, one of three
SBU Manager vacancies.  (See id. at 102; Ford Decl., Ex. 50,
Ex. 13 at 15.)  Rose Bacchus, an African-American female who was
53 years old in January 2000, was the Director of Employee
Services[6] for Amtrak and the decisionmaker with respect to the
NEC Manager position for which plaintiff applied.  (See Defs.'
Stmt. Fact ¶¶ 52, 53, 59; Ford Decl., Ex. 13 at 15, 17.)  Bacchus
testified in a deposition that the Employee Services unit acted
as an "ombudsman" for employees (see Defs.' Stmt. Fact ¶ 55),
serving as a "resource" for any questions or problems that any
employee had and working to "pull the right people together" to
get any questions or problems resolved quickly.  (Id. ¶¶ 55, 56.)
The Employee Services unit consisted of only Bacchus and the four
managers she supervised -- one for each of the SBUs (NEC, Inter-
City and West) and one to handle whistleblower and ADA issues.
(See id. ¶¶ 57, 58.)  Bacchus interviewed candidates for the

---

[6]     Bacchus retired from Amtrak in October 2001.  (See Ford
Decl., Ex. 13 at 5.)

three SBU manager positions in December 1999, and January and
February 2000.  (<u>See</u> Ford Decl., Ex. 15, Ex. 18 and Ex. 19.)

The October 1999 NEC Manager job posting provided that the
NEC Manager "[a]dministers and coordinates company sponsored
employee services to further the development of employee-company
relationships" (Ford Decl., Ex. 14), and indicated that the NEC
Manager "[o]ften conducts difficult employee counseling sessions
regarding hiring practices, salary, job classification,
promotion, discipline, performance and termination." (<u>Id.</u>) The
job posting further indicated that it was "preferred" that a
candidate have a bachelor's degree or senior human resource
management certification (<u>see id.</u>), and provided that a candidate
"[m]ust effectively create and use written materials, oral
presentations and [verbal] interchange, and be at ease working
with [senior] staff members." (<u>Id.</u>)

Michael Ramirez, a Senior Director of Workforce Management
at the time, was 43 years old when Amtrak posted the NEC Manager
position in October 1999. (<u>See</u> Defs.' Stmt. Fact ¶¶ 66, 67;
Pl.'s Stmt. Fact ¶ 66.) Ramirez provided assistance to Bacchus
in the interview and selection process (<u>see</u> Pl.'s Stmt. Fact
¶ 68), but "it really was [Bacchus's] decision" on whom to hire
for the NEC Manager position (Ford Decl., Ex. 13 at 66), subject

- 14 -

to approval from her supervisor Gerri Hall.  (See Walfoort Decl.,
Ex. 16 at 71-72.[7])

Bacchus created interview forms and wrote the interview
questions for the NEC Manager position.  (See Ford Decl., Ex. 13
at 28.)  Bacchus and Ramirez used the same form and asked the
same questions of each candidate during the interview process.
(See id. at 41.)  Bacchus testified in her August 2002 deposition
that although she tried to use the candidate rating system --
strong, good and weak -- that she included on the interview form
(see id. at 41, 64-65), she "may not have checked it every time
. . .."  (Id. at 41.)

According to Bacchus, in comparison to a candidate's written
application or resume, the interview process was the "key
component" to the selection process for the SBU manager
positions.  (See id. at 62.)  Bacchus testified that "the
interview would certainly override, would be more important to
[her] than the application because [she] get[s] more information
from the interview."  (Id.)  She explained that at the interview

---

[7]     Bacchus testified in her August 2002 deposition that
seeking Hall's approval was a "formality" and that the verbal
notification to Hall was to merely inform her that she was about
to fill the NEC Manager position.  (See Walfoort Decl., Ex. 16 at
71-73.)

stage, she was interested in having a candidate elaborate on the words contained on her or his application or resume.  (See id. at 63.)

Bacchus testified that it was important for the Employee Services SBU managers to have (1) interpersonal communication skills; (2) knowledge of Amtrak; (3) relationships, such as professional networks, within Amtrak; and (4) an ability to appropriately bring all of these together.  (See id. at 29.)  She defined interpersonal communication skills to include "listening as well as the ability to communicate with all levels of people in a variety of situations" (id. at 30), and knowledge of Amtrak such as knowing the organization's lines of division, as well as the spheres of responsibility for different employees in particular areas within Amtrak.  (See id.)  Bacchus testified that relationships within Amtrak means establishing professional networks within various parts of the organization.  (See id. at 30-31.)

According to Bacchus, the ability of the Employee Services SBU managers to bring all of these attributes together was necessary because

> a large part of the job with so many people and one person doing it is being able to reach out and bring the appropriate people together to expedite things getting done. And part of the job is to remove the logjams that are there. So necessarily in order to avoid them you have to know what

they are, and that's what I mean by the network pieces.  Who
can I call with this problem?  Who can get it done right
now?

(Id. at 31.)  Bacchus believed that the Employee Services SBU

manager's networking capability was "absolutely critical" to the

job, and that the SBU managers would need to use discretion, good

judgment and maturity in dealing with individual personalities.

(See id. at 33.)

    Ramirez testified in his April 2002 deposition that, with

respect to the NEC, Intercity and West manager positions, he and

Bacchus discussed having a diverse group of managers:

    In this particular position -- and I'm saying all three
    positions -- we were hoping to have a diverse group.. . .
    [W]e were hoping that . . . we would have a nice mix.  You
    know, it would help the diversity issue, a mix of -- you
    know, taking into account gender and race and national
    origin.  And that's a general subject that is discussed with
    hiring managers all the time.

(Walfoort Decl., Ex. 13 at 124-25.)  Bacchus testified during her

deposition that diversity was not an issue and that the topic

never came up in discussions with Ramirez.  (See id., Ex. 16

at 60.)

    In January 2000, Bacchus selected Carolyn Janet Harvey for

the Employee Services Intercity Manager position.  (See Defs.'

Stmt. Fact ¶ 72; Ford Decl., Ex. 18.)  Harvey is an African-

American female and was 51 years old when Bacchus selected her

for the position.  (See Defs.' Stmt. Fact ¶ 72.)  Bacchus

selected Harvey because she "had been around . . . about 28 years or so.  She knew literally . . . every organizational reference change.  She knew the people.  She knew the politics.  She knew the culture."  (Ford Decl., Ex. 13 at 58; <u>see</u> Defs.' Stmt. Fact ¶¶ 73, 74.)  Bacchus also hired the Employee Services West Manager in January 2000, selecting Robin Brown for the position. (<u>See</u> Defs.' Stmt. Fact at ¶ 75; Ford Decl., Ex. 19.)  Brown, an African-American female who was 36 years old at the time Bacchus selected her, had been employed by Amtrak for about 18 years. (<u>See</u> Defs.' Stmt. Fact at ¶ 75; Ford Decl., Ex. 13 at 58-59.) Bacchus characterized Brown's knowledge of Amtrak as similar to that of Harvey, and stated that Brown "knew [the Western Region] inside out" and was "well respected[.]"  (Ford Decl., Ex. 13 at 59.)  Amtrak confirmed Harvey's and Brown's selections by letters dated January 7, 2000, and indicated that their promotion date would be January 16, 2000.  (<u>See</u> <u>id.</u>, Ex. 18 and Ex. 19.)

Amtrak posted the NEC Manager job listing on two occasions, from October 7 to October 14, 1999, and from January 26 to February 2, 2000.  (<u>See</u> <u>id.</u>, Ex. 15.)  Plaintiff, along with four other candidates, interviewed for the NEC Manager position in December 1999.  (<u>See</u> Defs.' Stmt. Fact ¶ 78.)  She met with Bacchus and Michael Ramirez on December 16, 1999.  (<u>See</u> Defs.' Stmt. Fact ¶ 62; Ford Decl., Ex. 15.)  According to Bacchus,

plaintiff was her lowest ranking candidate for the NEC Manager position.  (See Ford Decl., Ex. 13 at 45.)  Bacchus believed that plaintiff's tenure of only "a couple of years" with Amtrak "showed . . . [in] her awareness about the organization itself . . .."  (Id.)  Bacchus testified that she was concerned about having to "probe more" to try to get complete answers from plaintiff to the interview questions.  (See id.)  Plaintiff's answers "just made [Bacchus] far less comfortable than was necessary" (id. at 46), and Bacchus felt that they were not in-depth or thoughtful.  (See Defs.' Stmt. Fact ¶ 98; Ford Decl., Ex. 13 at 46-47.)

Ramirez also ranked plaintiff low in comparison to the other candidates interviewed in December 1999, placing her near the bottom of his list.[8]  (See Ford Decl., Ex. 17 at 118; Defs.' Stmt. Fact ¶ 92; Pl.'s Stmt. Fact ¶ 92.)  Ramirez testified that "[t]he skill sets that [plaintiff] possesse[d] weren't necessarily the skill sets that [they] were looking for specifically for the manager of employee services."  (Ford Decl., Ex. 17 at 117.)  According to Ramirez, he and Bacchus agreed that although plaintiff met the minimum qualifications for the

---

[8]    Ramirez testified that assuming there were five candidates at the time he ranked the candidates, he "probably" would have ranked plaintiff fourth.  (See Ford Decl., Ex. 17 at 118.)

- 19 -

position, she was not "considered the most highly qualified
candidate." (Id.)  Ramirez testified that he and Bacchus
discussed plaintiff's "difficulty in responding to the questions
in concise, clear answers" and that they "had to continuously
rephrase questions or keep probing in order to elicit responses"
from plaintiff.  (See id.)

Plaintiff was notified on January 21, 2000, that she had not
been selected for the NEC Manager position.[9]  (See id., Ex. 16.)
On January 24, 2000, Robert Dougherty, a white male Amtrak
employee, interviewed for the NEC Manager position.  (See Pl.'s
Stmt. Fact ¶ 198; Ford Decl., Ex. 15.)  Two days later, Amtrak
re-posted the availability of the NEC Manager position (see Ford
Decl., Ex. 15), and Dougherty formally submitted an application
for the position around February 1, 2000.  (See Walfoort Decl.,
Ex. 33.)

Amtrak employee Barry Warner also submitted an application
for the NEC Manager position after the second job posting (see
Ford Decl., Ex. 21), and completed his interview on February 11,
2000.  (See id., Ex. 15.)  Warner is a white male, was 52 years
old in February 2000 and had been employed by Amtrak since 1976.

---

[9]     Bacchus testified that she did not discuss and assess
with Ramirez the candidates for the NEC Manager position, and a
selection for the position was not made, until after all of the
candidates had been interviewed.  (See Ford Decl., Ex. 13 at 65-
66.)

(<u>See</u> Defs.' Stmt Fact ¶¶ 79, 80; Ford Decl., Ex. 15, Ex. 13 at 61, Ex. 20 at 1 and Ex. 21.)

Plaintiff asserts that Dougherty was offered the NEC Manager position and turned the offer down.  (<u>See</u> Pl.'s Stmt. Fact ¶ 198.)  On February 18, 2000, Ramirez sent Dougherty a letter confirming his rejection of an offer for the NEC Manager position.[10]  (<u>See</u> Walfoort Decl., Ex. 34 ("We regret that you were unable to accept our offer for the position of Manager, Employee Services, Amtrak Northeast Corridor.").)  That same day, Ramirez sent Warner a letter congratulating him on having been offered the NEC Manager position, confirming Warner's acceptance of the job offer, and notifying him that his promotion date would be March 1, 2000.  (<u>See</u> <u>id.</u>, Ex. 15.)  According to Bacchus, she selected Warner because "[h]e had a knowledge of the entire organization . . . not limited to the corridor."  (Ford Decl., Ex. 13 at 44.)  Bacchus also believed Warner had "an extraordinary background in interviewing and investigations" and "a great desire to do the [NEC Manager] job."  (<u>Id.</u>)

## V.  PLAINTIFF'S DEGENERATIVE ARTHRITIS CONDITION

Plaintiff claims to suffer from degenerative arthritis. (<u>See</u> Defs.' Stmt. Fact ¶ 10; Pl.'s Stmt. Fact ¶ 10.)  Plaintiff

---

[10]     Bacchus testified that she was unaware that an offer had been extended to Dougherty.  (<u>See</u> Walfoort Decl., Ex. 16 at 75-76.)

admits that the condition did not interfere with her duties as an HR Consultant, but asserts that it caused her to use a cushioned chair at work and to have a slight limp on occasion. (See Defs.' Stmt. Fact ¶ 11; Pl.'s Stmt. Fact ¶ 11.)  "At various times, [Porter and plaintiff] talked about [their] back problems" (Walfoort Decl., Ex. 6 at 233), and Porter "was aware that [plaintiff] periodically had pains" and knew that Amtrak provided her with an oversized chair. (Id. at 233-234.)  Plaintiff asserts that she informed Porter in December 1999 that she needed surgery due to her degenerative arthritis condition. (See Pl.'s Am. Compl. ¶ 15; Pl.'s Opp'n at 42, 43.)

## DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998).  The record must be viewed in the light most favorable to the nonmoving party.  See Aka, 156 F.3d at 1288.

The moving party carries the initial burden to either identify evidence that demonstrates the absence of a genuine issue of material fact, see Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986), or "point[] to the absence of evidence proffered
by the nonmoving party."  Baker v. Potter, 294 F. Supp. 2d 33, 38
(D.D.C. 2003).  Summary judgment is inappropriate if a reasonable
factfinder could find in the non-moving party's favor.  "The non-
moving party's opposition, however, 'must consist of more than
mere unsupported allegations or denials and must be supported by
affidavits or other competent evidence setting forth specific
facts showing that there is a genuine issue for trial.'"  McCain
v. CCA of Tenn., Inc., 254 F. Supp. 2d 115, 119 (D.D.C. 2003)
(citation omitted); see Harding v. Gray, 9 F.3d 150, 154 (D.C.
Cir. 1993) ("[M]ere unsubstantiated allegation . . . creates no
'genuine issue of fact' and will not withstand summary
judgment."); Sage v. Broadway Publ'ns, Inc., 997 F. Supp. 49, 53
(D.D.C. 1998) ("Conclusory allegations made in affidavits
opposing a motion for summary judgment are insufficient to create
a genuine issue of material fact."); Baker, 294 F. Supp. 2d at 38
(nonmoving party may not rely solely on allegations or conclusory
statements).  "If the evidence 'is merely colorable, or is not
significantly probative, summary judgment may be granted.'"
Baker, 294 F. Supp. 2d at 38 (quoting Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 249-50 (1986)).

Discrimination claims brought under Title VII, § 1981, the
ADEA, the ADA and the DCHRA are governed by the burden-shifting

framework articulated by the Supreme Court for Title VII cases in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  See Carney v. Am. Univ., 151 F.3d 1090, 1092-93 (D.C. Cir. 1998) (§ 1981); Hall v. Giant Food, Inc., 175 F.3d 1074, 1077 (D.C. Cir. 1998) (ADEA); Marshall v. Fed. Express Corp., 130 F.3d 1095, 1099 (D.C. Cir. 1997) (ADA); Futrell v. Dep't of Labor Fed. Credit Union, 816 A.2d 793, 802 (D.C. 2003) (DCHRA).  Under that framework, the plaintiff has the initial burden of demonstrating by a preponderance of the evidence a *prima facie* case of discrimination.  See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  If a plaintiff succeeds in establishing her *prima facie* case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment action being challenged.  See id. at 253.  The employer "need not persuade the court that it was actually motivated by the proffered reasons."  Id. at 254.  Rather, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (internal quotations omitted).

If the defendant proffers a legitimate and nondiscriminatory reason for its employment decision, the plaintiff must have an opportunity to prove by a preponderance of the evidence that the offered reason was not its true reason, but was a pretext for intentional discrimination.  See Burdine, 450 U.S. at 253.  A plaintiff may meet her burden of proving intentional discrimination by "'either directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"  Dunaway v. Int'l Bhd. of Teamsters, 310 F.3d 758, 763 (D.C. Cir. 2002) (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)).  Ultimately, the question is whether the jury could infer discrimination based on a combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to challenge the employer's proffered reasons for its decision; and (3) any additional evidence of discrimination that may be available to the plaintiff (e.g., independent evidence of discriminatory attitudes or statements attributable to the employer).  See id. (citations omitted); Aka, 156 F.3d at 1289.  The ultimate burden of persuasion that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  See Burdine, 450 U.S. at 253.

I.   **JANUARY 2000 TERMINATION**

A.   <u>**Race and gender discrimination under Title VII and § 1981**</u>

Defendants virtually concede in their motion for summary judgment that plaintiff has made out a *prima facie* case of race and sex discrimination under Title VII and § 1981 with respect to her discriminatory termination claim.[11]  (<u>See</u> Defs.' Mem. Supp.

---

[11]   The individual defendants contend, however, that they are not subject to suit as individuals under § 1981.  (Def.'s Mot. to Dismiss at 10.)  Unlike under Title VII, individual defendants can be sued for intentional race discrimination under § 1981 if they are personally involved in the discrimination or if plaintiff can "demonstrate some affirmative link to causally connect" the individual defendant with the discriminatory act. <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 229 (2d Cir. 2004); <u>see also</u> <u>Flores v. Denver</u>, 30 Fed. Appx. 816, 819 (10th Cir. 2002) (holding that the individual defendant does not have to be in privity of contract with the plaintiff to be held liable under § 1981); <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 75 (2d Cir. 2000); <u>Al-Khazraji v. Saint Francis Coll.</u>, 784 F.2d 505, 518 (3d Cir. 1986); <u>Jones v. Continental Corp.</u>, 789 F.2d 1225, 1231 (6th Cir. 1986); <u>Tillman v. Wheaton-Haven Recreation Ass'n, Inc.</u>, 517 F.2d 1141, 1146 (4th Cir. 1975).  <u>But see</u> <u>Foley v. Univ. of Houston Sys.</u>, 355 F.3d 333, 338 (5th Cir. 2003) (noting "a tension between [two] decisions . . . with respect to the liability of individual defendants who are not party to the employment contract" under § 1981).  The persuasive authority in this district also supports this view.  <u>See e.g.</u>, <u>MacIntosh v. Bldg. Owners & Managers Ass'n Int'l</u>, 355 F. Supp. 2d 223, 227 (D.D.C. 2005)(noting that the reach of §1981 is much broader than that of Title VII); <u>Richard v. Bell Atl. Corp.</u>, 946 F. Supp. 54, 74 (D.D.C. 1996) (holding that "[o]fficers, directors and employees of a corporation may become personally liable" under § 1981) (internal quotations omitted); <u>Sheppard v. Dickstein, Shapiro, Morin & Oshinsky</u>, 59 F. Supp. 2d 27, 33 (D.D.C. 1999); <u>Weaver v. Gross</u>, 605 F. Supp. 210, 212-213 (D.D.C. 1983) (holding that individuals can be held liable under § 1981 only when they have been personally involved or directly participated in the discrimination).  <u>Contra</u> <u>Hunter v. Ark Rests.</u>

Summ. J. at 12 ("For purposes of this motion only, defendant will assume that plaintiff has satisfied the minimal standards for a *prima facie* case with respect to her race, sex and age discrimination termination claims.").)  However, defendants proffer that they terminated plaintiff's employment based on a business decision in November 1999 resulting from the PWC review to restructure the Workforce Development unit, resulting in Amtrak's outsourcing to the American Management Association the leadership and supervisory training functions formerly resident in the Workforce Development unit.  According to defendants, Porter sought to have the Workforce Development unit provide greater support to Amtrak nationally by becoming more efficient and effective by focusing greater attention on training analysis and forecasting.  (See Ford Decl., Ex. 7 at 113.)  Porter's November 1999 power point presentation, which set forth her vision of a restructured Workforce Development unit, proposed eliminating the Workforce Development unit's leadership and supervisory training to "maximize [and] leverage internal resources, while expanding developmental networks," and

────────────────────

Corp., 3 F. Supp. 2d 9, 15-16, 17 (D.D.C. 1998) (stating that individuals cannot be held liable under § 1981 and DCHRA, but citing only Title VII cases to support that finding).  Section 1981, however, reaches only racial discrimination, and thus Green and Porter are subject to liability for only racial discrimination, and not gender discrimination, under Count I.

identified the HR Consultant, Leadership/Supervisory training
position for elimination.  (See id., Ex. 10 at 8.)  Plaintiff
developed and managed the majority of the training courses the HR
Department used in 1999, including "all leadership/supervisory
courses."  (Id., Ex. 23 at 405, Ex. 5 at 36-37.)

Defendants have set forth a legitimate and nondiscriminatory
basis for terminating plaintiff's employment, namely, plaintiff's
position was no longer needed due to Amtrak's decision to
outsource its leadership and supervisory training.  If accepted
as true by the trier of fact, the proffered justification would
sustain a finding that unlawful discriminatory animus did not
motivate Amtrak's decision to terminate plaintiff's employment.
See Hicks, 509 U.S. at 507.  The question thus becomes whether,
based on the evidence in the record, a reasonable jury could find
that defendants intentionally discriminated against plaintiff.
See Dunaway, 310 F.3d at 763.  Plaintiff seeks to carry her
burden of showing intentional discrimination by making several
assertions to demonstrate that (1) the defendants' proffered
legitimate and nondiscriminatory basis for her termination was
pretextual and is in material factual dispute, and (2) additional
evidence of defendants' discrimination could persuade a jury of
intentional discrimination against her.

- 28 -

### 1.   The PricewaterhouseCoopers "recommendation"

Plaintiff argues that it is "demonstrably false" that PWC "recommended the outsourcing of leadership training" (Pl.'s Opp'n at 7) in its December 1998 Assessment of Amtrak's Human Resources Function report.  (See Walfoort Decl., Ex. 26.)  She further argues that the falsity is "compounded" by Porter's testimony that restructuring the Workforce Development unit was not recommended to her by anyone.  (See Pl.'s Opp'n at 8; Walfoort Decl., Ex. 6 at 175-76.)  According to plaintiff, the fact that PWC did not make such a recommendation is irreconcilably inconsistent with defendants' proffered legitimate and nondiscriminatory basis for terminating her employment, and thus amounts to pretext.

The inconsistency on which plaintiff attempts to rely does not appear to exist, however.  Defendants' interrogatory response actually states that, "[a]s a result of the [PWC] review, Amtrak decided to outsource the supervisory/leadership programs" (Walfoort Decl., Ex. 25 at 4), and nowhere suggests that PWC made a specific recommendation regarding plaintiff's position as an HR Consultant.  Contrary to plaintiff's assertion, the evidentiary record with respect to the PWC report does not undermine defendants' proffered basis for terminating her employment.  (See Ford Decl., Ex. 29 at 77 (Hall deposition testimony in relation

to questions regarding the decision to outsource leadership and
supervisory training that "following the findings of [PWC],
[Amtrak] made a number of changes in Human Resources," and held
regular meetings involving senior staff -- including Porter -- to
"discuss transferring functions, reporting structures and the
like").)

Further, although Porter did testify that she made the
decision to restructure the Workforce Development unit, her
testimony does not suggest that the decision was made in total
isolation as plaintiff suggests.  (See Pl.'s Opp'n at 8 ("Porter
testified that she made the decision entirely on her own
. . ..").)  Indeed, Porter testified that she discussed her
restructuring proposal with her supervisor, Gerri Hall, during
several meetings[12] (see Ford Decl., Ex. 7 at 113-16), and arrived
at her decision after having consulted with the three SBU

---

[12]    Plaintiff's allegation that Hall "denied discussing the
proposal" with Porter (Pl.'s Stmt. Fact ¶ 148) is not supported
by the record.  Though Hall generally did not recall the
specifics of any discussions with Porter regarding plaintiff's
termination, she testified that Porter's November 1999 power
point presentation "looked familiar" (Ford Decl., Ex. 29 at 82),
that she was sure that she participated in the decision to
outsource leadership and supervisory programs in her capacity as
Assistant Vice-President (see id. at 76), and that the decision
to terminate plaintiff's employment "would have been a collective
decision in which [she] would have had a major role."  (Id.
at 106.)  Moreover, plaintiff's suggestion that Hall fabricated
her lack of recollection (see Pl.'s Opp'n at 9 n.5) is conclusory
and speculative.

presidents -- Stan Bagley, Gill Mallory and Lee Bullock.  (<u>See</u>
<u>id.</u> at 131-32, 175-76.)

Because there are no substantive or material inconsistencies
with respect to the PWC report and defendants' proffered
explanation for its business decision, the report does not create
a genuine issue of material fact regarding whether defendants'
proffered explanation is mere pretext for unlawful racial or
gender discrimination or otherwise could not be accepted.

**2.   Porter's selection of the American Management
Association to provide the outsourced leadership
and supervisory training**

Plaintiff asserts that pretext is also established by
alleged testimonial inconsistencies between Porter and Hall.  In
contrast to Porter's testimony that she selected AMA to provide
the outsourced leadership and supervisory training, Hall
purportedly testified at her deposition that "'the plan' was to
use 'a <u>host of entities</u> that provide these type of programs all
over the country.'"  (Pl.'s Opp'n at 9 (emphasis in original).)
Hall also testified that "[b]efore we really got into
[outsourcing leadership and supervisory training] in terms of
some regularity and really bolstering up that approach, [Amtrak]
had yet another change in focus or vision of the company."
(Walfoort Decl., Ex. 5 at 72-73; Pl.'s Opp'n at 9.)  Further,
Hall testified that she did not recall whether AMA provided any

leadership training courses (see Walfoort Decl., Ex. 5 at 84;
Pl.'s Opp'n at 10), and Porter was allegedly unaware of "any
documents at Amtrak pertaining to AMA." (Pl.'s Opp'n at 10.)

Again, however, the inconsistencies on which plaintiff seeks
to rely do not appear to exist. Hall did not testify during her
deposition that "the plan" was to use a "host of entities," but
instead testified that "the plan was to have [the outsourced
leadership and supervisory training programs] function dependent
on the need." (Walfoort Decl., Ex. 5 at 73.[13]) Hall then
testified that "there are a host of entities that provide these
types of programs all over the country . . .."[14] (Id.)
Plaintiff's effort to turn Hall's statement regarding the general
existence of "a host of entities" into a declaration that Amtrak

---

[13]    Porter similarly testified that the decision to
outsource leadership and supervisory training was in part based
on the need to become more responsive to the SBUs by "target[ing]
the training to their specific needs." (Ford Decl., Ex. 7
at 131-32.)

[14]    Hall's testimony in this regard is entirely consistent
with Porter's testimony that she wanted to explore "national
programs" that could support the objective of becoming more
responsive to the SBUs' leadership and supervisory training
needs. (See Ford Decl., Ex. 7 at 133.) Porter identified two of
the programs she took under consideration -- AMA and the USDA
graduate school -- and testified that she ultimately selected the
AMA because it is national in scope, whereas the USDA graduate
school was "not as widespread or didn't cover as much geography"
as was needed for Amtrak's managerial population. (See id.
at 134.)

committed to using multiple organizations to provide the
outsourced services is misleading and unconvincing.

Further, the fact that Amtrak "had a change in focus or
vision" for the company and thus may not have utilized the AMA to
the full extent originally proposed does not, without more,
create any inconsistencies or suggest an intent by defendants to
unlawfully discriminate against plaintiff.  It is true that if
Amtrak had not utilized the AMA or any other third party to
provide leadership and supervisory training after it terminated
plaintiff's employment, a material issue of fact might arise as
to whether defendants' proffered decision was mere pretext for
discrimination.  Here, however, the record reflects that after
Amtrak terminated plaintiff's employment, the AMA did in fact
offer Amtrak employees multiple management and supervisory
training courses.  (See Ford Decl., Ex. 30 (Amtrak Education and
Development Catalog for Summer 2000, Fall 2000, Spring 2001 and
Fall 2001 listing management and supervisory courses provided by
the AMA).)  The record also reflects that Amtrak employees took
advantage of the courses offered by the AMA.[15]  (See id., Ex. 31

---

[15]    Plaintiff's allegation that Porter was "unaware of any
documents in the possession of Amtrak that pertained to [the]
AMA" (Pl.'s Stmt. Fact ¶ 146; see Pl.'s Opp'n at 10) is not
supported by her citation to the record and ignores Porter's
testimony about the AMA.  Porter testified that the AMA invoiced
Amtrak for the courses, she was responsible for making the
courses available to employees through a training catalogue, and

- 33 -

(employee invoices for courses offered by the AMA or its divisions).[16])

Moreover, contrary to plaintiff's assertion, Porter did not testify that Amtrak was going to begin a "substantial relationship with [the] AMA" (Pl.'s Opp'n at 10), but rather testified regarding her reasons for selecting the AMA.  Thus, there is no inconsistency between Porter's testimony regarding why she selected the AMA, and Hall's testimony regarding a later change in direction made some time after plaintiff's termination.

Plaintiff's evidence regarding the AMA again does not raise a material dispute about Amtrak's decision to outsource the Workforce Development unit's leadership and supervisory training program, or Porter's decision to rely on the AMA to provide such training, or show that either was pretext for racial or gender discrimination.

_____

the Workforce Development unit tracked employee registration for and attendance at the AMA courses.  (<u>See</u> Ford Decl., Ex. 7 at 149-152.)

[16]   In opposition to Amtrak's motion for summary judgment, plaintiff states that Amtrak untimely "produced documents suggesting Amtrak employees attended a number of training sessions offered by the AMA in 2000 and 2001" and asks that "those documents . . . not be considered in resolving [Amtrak's] motion."  (Pl.'s Opp'n at 10 n.7.)  However, plaintiff does not identify in her opposition to Amtrak's motion for summary judgment the documents to which she refers, and the court will not guess as to which documents she means.

- 34 -

### 3.  Paul Bello's hiring by Amtrak

Plaintiff alleges that defendants' proffered explanation for her termination is pretext because "[a]t the same time [Porter] was preparing to terminate [her], [Porter] . . . developed a new position (Manager, Assessment and Measurement)[,]"[17] into which Porter "unceremoniously" placed Paul Bello, a white, male, non-disabled HR Consultant hired by Amtrak in May 1999.  (See Pl.'s Opp'n at 17; Pl.'s Am. Compl. ¶¶ 13, 14.)  Plaintiff contends that Amtrak never posted the newly created position, instead "simply mov[ing] Mr. Bello into it without competition" (Pl.'s Opp'n at 17), and continued to employ Bello at the time Amtrak

_____

[17]   Plaintiff's allegation that Porter created, and placed Bello in, the Manager of Assessment and Measurement position (see Pl.'s Stmt. Fact ¶ 172) is not supported by her citations to the record.  Plaintiff does not cite to any testimony in the record to demonstrate that Porter in fact testified about creating a new position or having placed Bello into the position, but cites instead to a job posting for the position.  (See id. (citing to Walfoort Decl., Ex. 29).)  That job posting establishes neither the actual creation of the Manager, Assessment and Measurement position nor that Amtrak placed Bello into the position.  More importantly, plaintiff admits that there is no evidence to establish that Bello assumed such a position:

> Bello's personnel records show that there is no change from his title as 'Human Resources Consultant' in December 1999. In March 2000, his position changed from HR Consultant to Senior Manager. . . .  In November 2001 he was Senior Manager, Test Administration. . . .  There is no record showing that he was 'Manager of Assessment and Measurement' as reflected in the Position Description.

(Pl.'s Stmt. Fact ¶ 176 (internal citations omitted).)

- 35 -

terminated her employment.  (See Pl.'s Opp'n at 13, 17.)  In

essence, plaintiff asserts that defendants' outsourcing

explanation is pretext because, if the real reason for her

termination was the restructuring of the Workforce Development

unit, Amtrak would have also eliminated Bello's HR Consultant

position.[18]

To prevail on this claim, plaintiff would need to

demonstrate that she was similarly situated to Bello in all

relevant aspects of employment.  See Holbrook v. Reno, 196 F.3d

255, 261 (D.C. Cir. 1999) (holding that in order for plaintiff to

prove that she was similarly situated to three other employees,

she had to "demonstrate that all of the relevant aspects of her

employment situation were nearly identical to those" of the other

employees) (citations and internal quotations omitted); Barbour

v. Browner, 181 F.3d 1342, 1345 (D.C. Cir. 1999) (same).  The

evidentiary record demonstrates that Amtrak hired Bello into his

HR Consultant position because of his "[e]xperience in the design

───────────────────

[18]    Plaintiff's opposition does not suggest, as defendant
apparently assumes, that she is challenging Bello's hiring in
May 1999 as being a discriminatory act.  Such an argument would
fail because she offers no evidence to establish that she ever
applied for the position.  See Morgan v. Fed. Home Mortgage
Corp., 328 F.3d 647, 650 (D.C. Cir. 2003) (stating that in order
to demonstrate a prima facie case of discriminatory failure to
hire, a plaintiff must show, among other things, "'that [she]
applied and was qualified for a job for which the employer was
seeking applicants'") (quoting McDonnell Douglas Corp. v. Green,
411 U.S. 792, 802 (1973)).

and development of automated systems to measure and track key performance indicators" (Ford Decl., Ex. 33), as well as his "[i]ndepth knowledge of transactional delivery systems . . .." (Id.)  His knowledge of training was a subsidiary factor.  (See id.)  Although plaintiff makes the allegation that the HR Consultant positions were fungible (see Pl.'s Opp'n at 12), other than her own conclusory statements, she offers no evidence -- such as job descriptions for each HR Consultant position -- to establish that her HR Consultant position was similar in all material respects to the position held by Bello.  Because plaintiff has not demonstrated that she was similarly situated to Bello in all relevant aspects of employment, Amtrak's retaining Bello at the time the company terminated her employment does not support her claim of pretext.

### 4.  Company-wide, performance-based downsizing initiative

Plaintiff argues that because her employment termination occurred when a "top-down downsizing, based on job performance evaluations . . . was imminent" (Pl.'s Opp'n at 14), Amtrak's decision to restructure the Workforce Development unit has a "flavor of a preemptive measure" and "does not appear to be a rational or neutral business decision."  (Id.)  The "imminent" downsizing to which plaintiff refers was a corporate-wide

initiative under which the HR Department as a whole would sustain
a 10% performance based reduction-in-force.  (See Walfoort Decl.,
Ex. 5 at 139-41.)  In order for plaintiff's speculative assertion
to have any merit, she would have to establish that in developing
the restructuring proposal, Porter knew which employees in the
Workforce Development unit, if any, would be affected by the
reduction-in-force and, knowing that plaintiff was not in the at-
risk 10% of HR Department employees, took deliberate action to
eliminate her position on the basis of her race or gender.
Plaintiff admits, however, that Porter "could not have known with
certainty which employees she was in danger of losing" as a
result of the performance based reduction-in-force.  (Pl.'s Opp'n
at 14.)

Because plaintiff presented no evidence to reasonably
suggest that Porter's decision to restructure the Workforce
Development unit was anything other than an independent, neutral
business decision,[19] the evidence regarding the 10% performance

---

[19]    Unrelated to the performance-based downsizing
initiative, plaintiff also asserts that Amtrak disregarded the
terms of a consent decree while implementing Porter's Workforce
Development unit restructuring proposal because the company
failed to conduct a disparate impact analysis before terminating
her employment, thus "lend[ing] strength to the inference that
she was not regretfully terminated" due to the nondiscriminatory
business justification proffered by Amtrak (restructuring the
Workforce Development unit).  (See Pl.'s Opp'n at 21-22.)  A
June 21, 2000 consent decree in McLaurin v. National R.R.
Passenger Corp., Civil Action No. 98-2019 (EGS) (D.D.C.), signed

- 38 -

based reduction-in-force does not help plaintiff establish that defendants' proffered explanation for plaintiff's termination is pretextual.

### 5. Relocation of plaintiff's duties to Delaware

Plaintiff argues that her duties were not outsourced as defendants claim, but rather were relocated to a position in Delaware. (See Pl.'s Opp'n at 19-20.)  To support her arguments, plaintiff relies on the following testimony of Michael Ramirez:

Q:   Not test development, but training development?

A:   Not test, but training development.

Q:   And do you know about how many jobs?

A:   One maybe, two perhaps, one for sure.

Q:   Okay.  And the one or two jobs were in training development?

A:   Yes.

Q:   And when you say one for sure, are you thinking of a particular individual's job?

---

nunc pro tunc to September 2, 1999, requires Amtrak to "perform an analysis" of any reduction-in-force it intends to implement to "determine if it will have a disparate impact on African American Management employees."  (Walfoort Decl., Ex. 27 at 18.) Plaintiff, however, presented no evidence to demonstrate that she fell within the meaning of "Management employee" as the term is defined in the consent decree.  (See Walfoort Decl., Ex. 27 at 4 ("'Management employees' . . . means employees or positions not subject to a collective bargaining agreement . . ., and not on the Amtrak Management Committee.").)

- 39 -

A:    Yes.

Q:    What individual was that?

A:    The position that -- an employee by the name of Elayne

      Mitchell.

Q:    Okay.  And that position was moved up to the Wilmington

      training center?

A:    Yes.

(Walfoort Decl., Ex. 13 at 94.)

      Out of context, this limited excerpt shows little.
Plaintiff provides no preceding or succeeding excerpts to show,
for example, whether Ramirez's testimony was in response to
questions specifically about continued leadership and supervisory
training by Amtrak, or general questions about training
development.  Plaintiff supports her insinuation that the
Wilmington HR Consultant position was not a "new" position, but
instead was the position she held in the Workforce Development
unit, with no objective evidence from which such an inference can
be made, such as a comparison of job descriptions for the
position she held before her termination versus the Wilmington
position that Amtrak posted in January 2000.  Indeed, on its
face, the Wilmington HR Consultant job description does not
contain any references to leadership and supervisory training
responsibilities as a component of the position.  (See Ford

- 40 -

Decl., Ex. 38.)  Even accepting as true that Ramirez's testimony
suggests Amtrak moved aspects of plaintiff's job to Wilmington
after terminating her employment,[20] it does not, without more,
suggest that Amtrak also moved its leadership and supervisory
training there -- as opposed to outsourcing it to the AMA as
Porter originally conceived.

Plaintiff also argues that the fact that the company did not
specifically solicit her application for and transfer her into
the Wilmington HR Consultant position somehow shows that
defendants' explanation for her termination is false and is
pretext for discrimination.  (See Pl.'s Opp'n at 20-21.)  Why
Amtrak *sua sponte* should have placed plaintiff in the position
she has not shown was comparable to hers is not apparent.  In any
event, plaintiff does admit that Amtrak informed her that she
could seek employment elsewhere within the company during her two
week notice period in January 2000.  (See Ford Decl., Ex. 5 at
128.)  According to Amtrak, there were five openings in the HR
Department in January 2000, and two of those openings were for
the position of HR Consultant.  (See Walfoort Decl., Ex. 10 at 3
and Ex. 11 at 3; Pl.'s Stmt. Fact ¶ 168.)  The Wilmington HR
Consultant position was one of the vacant positions.  (See Pl.'s

---

[20]    Plaintiff has not even shown the time period to which
Ramirez's testimony applies.

Stmt. Fact ¶ 168; see also Ford Decl., Ex. 38 (job posting for
Wilmington HR Consultant position with a posting date range from
January 12, 2000 to January 19, 2000).)

Plaintiff testified during her deposition that she "called
the [HR] office to find out what was posted" with respect to job
openings (Ford Decl., Ex. 5 at 128; see Walfoort Decl., Ex. 3
¶ 25), but admits that she never applied for any Amtrak job
openings after Amtrak provided her with a termination notice
letter on January 7, 2000.[21]  (See Ford Decl., Ex. 5 at 133-34.).
According to plaintiff, however, she was not provided information
about the Wilmington HR Consultant position (see Pl.'s Stmt. Fact
¶ 165), thus precluding her from applying for the open position.
Yet, even accepting her assertion as true, she fails to establish
how such a lack of notification is in any way linked to
defendants' decision to terminate her employment in the first
instance, let alone that the lack of notification was because of
her race or gender.

––––––––––––––––––

[21]    It is for this reason that there is no probative value
in plaintiff's allegation that Amtrak treated white male
employees -- Glen Stickler, Thomas Wiley and Barry Warner -- more
favorably by assigning or transferring them to other positions
when the company eliminated their positions.  (See Pl.'s Opp'n
at 19.)  These individuals all applied for the positions into
which they were placed.  (See Ford Decl., Ex. 40, Ex. 41 and
Ex. 42.)

- 42 -

Plaintiff's evidence is insufficient to permit a reasonable inference that the position from which she was terminated was reconstituted as the Wilmington HR Consultant position and not outsourced.  Nor is there any evidence that Amtrak purposefully denied her the opportunity to apply for the Wilmington position. Accordingly, plaintiff's assertions regarding the Wilmington HR Consultant position do not establish that Amtrak's proffered explanation for her termination is pretext for racial or gender discrimination.

### 6.  Disparate severance packages

Plaintiff also argues that pretext is demonstrated because Amtrak offered her a severance package that was not the same as the severance packages offered other employees terminated by Amtrak.  (See Pl.'s Opp'n at 30-31.)  She argues -- by inference -- that instead of the eight weeks severance pay Amtrak offered her, she should have been offered the same six-months severance pay that Amtrak offered two white employees whose jobs were eliminated in 2000 and 2001.  (See id. at 30-31.[22])  Plaintiff

---

[22]     Plaintiff also alleges that Amtrak did not utilize a "standard" formula to calculate the severance pay terminated employees received in association with Amtrak's 2000 performance based reduction-in-force.  (See Pl.'s Stmt. Fact ¶ 212; Pl.'s Opp'n at 30.)  Plaintiff cites Hall's deposition in which Hall testified that "the release agreement [in the 2000 performance based reduction-in-force] was shorter than the release agreements used in other restructurings" and she believed the terms to be "less generous."  (Walfoort Decl., Ex. 5 at 175.)  Hall further

further alleges that, whereas her eight weeks severance pay
package was contingent upon her agreement not to seek future
employment at Amtrak, "a (white female) employee terminated a
month after [she was] had no such proscription."  (Id. at 31.)

     In order to permit the inference plaintiff urges, she must
demonstrate that Amtrak offered severance packages that contained
more advantageous terms to other employees similarly situated in
all relevant aspects of employment.  See Holbrook v. Reno, 196
F.3d 255, 261 (D.C. Cir. 1999);  Barbour v. Browner, 181 F.3d
1342, 1345 (D.C. Cir. 1999).  Here, however, plaintiff's evidence
of disparate treatment does not involve similarly situated
employees.  The employee plaintiff refers to as a "white male"
who purportedly received a more generous six-month severance
payment at the time Amtrak terminated "his" employment (see Pl.'s
Opp'n at 30; Pl.'s Stmt. Fact ¶ 210; Walfoort Decl., Ex. 35) was
in fact an African-American female who was a Vice-President of
Human Resources in the NEC and whom this opinion will refer to as

_____

testified that, although she did not specifically recall, she
"would have anticipated that the language saying [that the
terminated employees were] not going to reapply would have been
there."  (Id.)  If any inference is to be drawn from Hall's
testimony regarding severance pay packages, it is that the terms
of the severance package Amtrak offered plaintiff were more
generous than those offered to the employees who lost their jobs
during the 2000 performance based reduction-in-force.  The fact
that Amtrak treated plaintiff more favorably than later
terminated employees does not advance her pretext argument.

- 44 -

"SW."[23]   (See Ford Decl., Ex. 44, Ex. 45.)   Contrary to
plaintiff's statement that SW "worked the same number of years"
as plaintiff did (see Pl.'s Opp'n at 30-31), Amtrak in fact hired
SW in May 1980, almost sixteen years before the company hired
plaintiff.   (See Ford Decl., Ex. 44.)   Plaintiff has not
demonstrated that she is similarly situated to SW in all material
respects.

Nor has plaintiff demonstrated that she is similarly
situated to the white female employee -- to be referred to here
as "CO" -- whom Amtrak purportedly terminated "a month after [she
was]" with no "provision barring re-application" with Amtrak.
(See Pl.'s Opp'n at 31.)   CO was Amtrak's Corporate Medical
Director (see Walfoort Decl., Ex. 5 at 184; Ford Decl., Ex. 46
at 1), whose position Amtrak terminated in November 2001 (see
Walfoort Decl., Ex. 5 at 194; Ford Decl., Ex. 46 at 1), almost
two years after Amtrak terminated plaintiff's employment.
Further, contrary to plaintiff's assertion, CO's signed release
agreement plainly stated that, "[i]n exchange for the benefits

---

[23]   Plaintiff attaches as an exhibit to the Walfoort
Declaration only the first page of the severance package Amtrak
offered SW in November 1999 (see Walfoort Decl., Ex. 35),
glaringly omitting the last two pages.  As those omitted pages
make plain, Amtrak included as a condition of SW's receiving the
six-month severance payment that she "agree not to seek
employment with Amtrak in the future."  (Ford Decl., Ex. 47
at 2.)

offered by Amtrak, [CO] agrees . . . not to seek employment with Amtrak in the future." (Ford Decl., Ex. 46 at 2.) Plaintiff was not similarly situated to CO in all material respects. Accordingly, because plaintiff has not offered any evidence that Amtrak treated similarly situated employees in a more favorable manner upon termination,[24] her evidence regarding her severance package does not demonstrate that defendants' proffered explanation for her termination is mere pretext for racial or gender discrimination.[25]

### 7. Disparate duties and opportunities

Plaintiff claims she was fired because Porter set her up to fail.[26] While this allegation is conclusory and speculative and

---

[24] Notably, moreover, plaintiff fails to explain how the terms of her January 2000 severance package demonstrate the existence of discriminatory motive in November 1999 when Porter decided to restructure the Workforce Development unit, particularly when there is no evidence to demonstrate Porter's involvement in preparing plaintiff's severance package. (See Ford Decl., Ex. 43 at 29, 125-26, 143, 184-86, 190 (Ramirez's testimony that, after receiving instruction from Gerri Hall, it was his responsibility to prepare plaintiff's severance package a few days before Amtrak eliminated her position).)

[25] Nor does plaintiff's evidence regarding the six circumstances above that she proffered to rebut Amtrak's neutral explanation for her termination demonstrate pretext with respect to her age discrimination in termination claims in Count II.

[26] She complains that her relationship with Porter "deteriorated over time" and "[became] increasingly bad" (Pl.'s Stmt. Fact ¶ 124), and that Porter "interfered with [plaintiff's] performance of her duties" (id. ¶ 125) and "did not allow [her] to respond to requests for training and assistance from personnel

- 46 -

does not create a genuine issue of material fact regarding
whether defendants' proffered explanation is mere pretext for
discrimination, <u>see</u> <u>Harding v. Gray</u>, 9 F.3d 150, 154 (D.C. Cir.
1993); <u>Sage v. Broadway Publ'ns, Inc.</u>, 997 F. Supp. 49, 53
(D.D.C. 1998); <u>McCain v. CCA of Tenn., Inc.</u>, 254 F. Supp. 2d 115,
119 (D.D.C. 2003), plaintiff has alleged facts which, if
believed, could be reasonably used by a jury to find intentional
discrimination against plaintiff in her termination.   Porter
allegedly required plaintiff "to accomplish ten customer service
training sessions, whereas her white male counterparts [Bello and
Stickler] were expected to conduct only three to five."   (Pl.'s
Stmt. Fact. ¶ 124.)   She further alleges that Porter "transferred
[plaintiff's] responsibility for evaluation and measurement to
Mr. Bello, and [her] customer service duties to Glen Stickler"
and did not allow her to attend certain training sessions that
Bello and Stickler were allowed to attend.   (<u>Id.</u> ¶ 125.)[27]
Plaintiff's allegation that Porter "did not appear to be

_____

in Corporate HR or from the directors of the SBUs."   (<u>Id.</u> ¶ 126.)

[27]    In their motion to dismiss, Green and Porter argue that
the plaintiff has not stated a claim of discrimination under
§ 1981 because plaintiff failed to allege that they intentionally
discriminated against the plaintiff.   (Def.'s Mot. to Dismiss at
12.)   The plaintiff did allege, however, that Porter began to
strip plaintiff of her duties and transfer her work to Bello
because he was a white male.   (<u>See</u> Pl.'s Am. Compl. ¶ 13.)   This
does not, as Green and Porter assert, "fall short" of a
sufficient allegation.

- 47 -

threatened by . . . male employees" (Walfoort Decl., Ex. 3 ¶ 20),

could further support her claim that defendants' proffered

explanation for her termination is mere pretext.[28]

Although Porter and Green are both African-American,

plaintiff's claim of racial discrimination against them does not

fail as a matter of law.  Intra-racial discrimination is

actionable under § 1981.  Saint Francis Coll. v. Al-Khazraji, 481

U.S. 604, 609-10, 612-13 (1987); see also Hansborough v. City of

Elkhart Parks & Recreation Dept., 802 F. Supp. 199, 206 (N.D.

Ind. 1992)(holding, in a Title VII case but relying on § 1981

cases, that the issue is not the plaintiff's physical

characteristics, but whether he was discriminated against by

other African-Americans "because he was born black"); Franceschi

v. Hyatt Corp., 782 F. Supp. 712, 723 (D.P.R. 1992) (holding that

the plaintiff "will be entitled to recovery if he convinces the

trier of fact that Puerto Ricans discriminated against him

because he was born . . . Puerto Rican"); Walker v. Sec'y of the

Treasury, 713 F. Supp. 403, 408 (N.D. Ga. 1989) (holding that in

a § 1981 case it "not controlling that . . . a black person is

---

[28]     Plaintiff suggests that because "Porter saw the arrival
of two African-American women, Ms. Green and Ms. Hall, into the
HR Department" during her tenure as Director of the Workforce
Development unit, Porter developed a bias against plaintiff,
"another African-American woman at her heels . . . ."  (Pl.'s
Opp'n at 16-17.)

suing a black person"). Contrary to Porter and Green's
contention that only "sub-group" intra-racial discrimination is
actionable, such as white defendants acting against a white Arab,
or light-skinned black defendants acting against a dark-skinned
black plaintiff (Mot. to Dismiss at 11 n.5), § 1981 is a broad
prohibition of racial discrimination, and "a distinctive
physiognomy is not essential to qualify for § 1981 protection."
Saint Francis Coll., 481 U.S. at 613.

Viewing this evidence in a light most favorable to
plaintiff, she has placed in issue sufficient material facts to
be entitled to have a jury resolve whether the basis for
plaintiff's termination was race or gender discrimination in
violation of Title VII or § 1981.[29]   Amtrak's motion for summary
judgment on plaintiff's race and gender discrimination in
termination claim in Counts I and III and defendants Green and
Porter's motion for summary judgment on plaintiff's race
discrimination claim in Count I therefore will be denied.

   B.   **Age discrimination under the ADEA**

Amtrak does not dispute that plaintiff has made out a *prima
facie* case of age discrimination in violation of the ADEA with
respect to her discriminatory termination claim.  (See Defs.'

---

[29]   Plaintiff's evidence does not suffice, however, to
demonstrate pretext or age discrimination in connection with her
ADEA termination claim in Count II.

Mem. Supp. Summ. J. at 12.)   In response to plaintiff's *prima
facie* case, Amtrak argues that it terminated plaintiff's
employment due to a business decision to restructure the
Workforce Development unit.   Because, as is discussed above,
Amtrak's proffered explanation is legitimate and non-
discriminatory, the burden shifts under the McDonnell Douglas
framework to plaintiff to demonstrate that the proffered
explanation is mere pretext for discrimination.   See Texas Dep't
of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

To demonstrate pretext with respect to her age
discrimination in termination claim, plaintiff offers the same
arguments and evidence discussed above concerning her race and
gender discrimination in termination claim.   As was determined
above, that evidence does not demonstrate pretext with respect to
plaintiff's age discrimination in termination claim.

Plaintiff's other evidence of pretext with respect to the
age claim is that (1) "[she] was the oldest employee" in the
Workforce Development unit (see Walfoort Decl., Ex. 3 ¶ 12);
(2) the decisionmakers -- Porter, Green and Hall -- were 13 to
27 years younger than she was at the time Amtrak terminated her
employment (see id.; Pl.'s Opp'n at 3 n.3); and (3) Bello was
18 years younger than plaintiff was and was not terminated in

January 2000 as part of Porter's efforts to restructure the

Workforce Development unit.

Even accepting as true plaintiff's current representations

regarding the age disparity[30] between herself, on the one hand,

and Porter, Green, Hall and Bello, on the other, she fails to

offer any additional evidence -- such as independent evidence of

_____

[30]   Plaintiff asserts in opposition to Amtrak's motion for
summary judgment that her actual date of birth is November 27,
1932 (see Pl.'s Stmt. Fact ¶ 2; Walfoort Decl., Ex. 1), which
would mean she was 67 years old at the time Amtrak terminated her
employment.  It is undisputed, however, that when Amtrak hired
plaintiff, she represented to the company that her date of birth
was November 27, 1940 (see Ford Decl., Ex. 2.), and that she made
no effort to inform Amtrak of her correct age before Amtrak
terminated her employment.  (See Defs.' Stmt. Fact ¶ 6; see also
Ford Decl., Ex. 5 at 170-71 (plaintiff's deposition testimony
that she had "not been totally truthful" about her age before and
during her employment with Amtrak and that she began to correct
that "little white lie" only after Amtrak terminated her
employment).)  It also appears, much to this Court's distress,
that plaintiff knowingly has made multiple false representations
about her age in official proceedings where her age was a
material element of her cause of action against her opponent.
Plaintiff represented to the Equal Employment Opportunity
Commission that she was 58 years old on September 5, 2000,
putting her date of birth on or after September 6, 1942  (see
Ford Decl., Ex. 3 ¶ 1), and similarly represented in her initial
complaint filed in this case that she was 59 years old on
August 30, 2001.  (See id., Ex. 4 ¶ 5.)  Plaintiff continued to
represent to this Court that her date of birth was sometime in
late 1942 up until at least January 2002.  (See Pl.'s Opp'n Mot.
Dismiss at 2.)  Whether this Court should decline to even
entertain plaintiff's age claims in light of this misconduct is a
question that will be left for another day.  Nevertheless,
because plaintiff cannot establish pretext with respect to her
ADEA claims irrespective of her date of birth, it is not
necessary to determine what, if any, effect plaintiff's "little
white lie" would otherwise have on her claims.

discriminatory attitudes or statements attributable to Amtrak --
that supports her ultimate burden of having to prove that Amtrak
intentionally discriminated against her because of her age.  See
Dunaway v. Int'l Bhd. of Teamsters, 310 F.3d 758, 763 (D.C. Cir.
2002); Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C.
Cir. 1998).  The record is devoid of any evidence to suggest that
plaintiff's age "actually motivated [Amtrak's] decision" to
terminate her employment or had "a determinative influence on the
outcome."  Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993).

Accordingly, because plaintiff cannot establish that
Amtrak's proffered legitimate and non-discriminatory basis for
terminating her employment in January 2000 is mere pretext for
age discrimination, Amtrak's motion for summary judgment on
plaintiff's age discrimination in termination claim in Count II
will be granted.

C.  **Perceived disability under the ADA**

In Count IV, plaintiff alleges that Amtrak violated the ADA
when it terminated her employment as an HR Consultant because
Amtrak perceived her as disabled.  (See Pl.'s Am. Compl. ¶ 37.[31])

---

[31]    In her opposition to Amtrak's motion for summary
judgment, plaintiff seeks for the first time to add a claim
against Amtrak under the ADA on the alleged basis that the
company unlawfully terminated her employment and refused to re-
hire her because she is "actually disabled."  (Pl.'s Opp'n at 38-
43.)  Plaintiff's amended complaint plainly limits her ADA claims
in Count IV to an alleged unlawful termination "on the basis of a

Under the <u>McDonnell Douglas</u> burden shifting framework applicable
to ADA claims, <u>see</u> <u>Marshall</u>, 130 F.3d at 1099, plaintiff has the
initial burden of establishing a *prima facie* case[32] by
demonstrating that Amtrak regarded her as having "a physical or
mental impairment that substantially limit[ed] one or more of
[her] major life activities . . .." 42 U.S.C. §§ 12102(2)(C),
12102(2)(A); <u>see</u> <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471,
489 (1999).  In order to fall within the ADA's definition of
being regarded as having a physical impairment, plaintiff must

---

perceived physical disability" and an alleged failure to re-hire
her in favor of another employee "who was not regarded as having
a disability." (Pl.'s Am. Compl. ¶¶ 37, 38.)  Plaintiff's
failure to amend her complaint under Fed. R. Civ. P. 15(a) bars
such a new ADA claim against Amtrak at this late stage of the
proceedings.  <u>Cf.</u> <u>Armstrong v. Reno</u>, 172 F. Supp. 2d 11, 24
(D.D.C. 2001) (not allowing plaintiff to assert at summary
judgment stage a constructive discharge claim that was not raised
in plaintiff's complaint).  More importantly, "[b]efore bringing
suit in federal court, ADA plaintiffs . . . must exhaust their
administrative remedies by filing an EEOC charge and giving that
agency a chance to act on it." <u>Marshall v. Fed. Express Corp.</u>,
130 F.3d 1095, 1098 (D.C. Cir. 1997).  Plaintiff offers no
evidence to establish that she raised her "actually disabled"
claim with the EEOC or D.C. Office of Human Rights. (<u>See</u> Ford
Decl., Ex. 23 ¶¶ 3, 5, 9, 10, 13 (plaintiff's EEOC affidavit
setting forth claims of unlawful discrimination under the ADA
solely on the alleged bases that Amtrak regarded her as having a
disability or treated other employees more favorably because the
company did not regard them as being disabled).)  Plaintiff's
"actually disabled" claims therefore will not be considered in
opposition to Amtrak's motion for summary judgment.

[32]   Amtrak does not concede that plaintiff has established
a *prima facie* case of perceived disability discrimination under
the ADA.

establish that Amtrak (1) mistakenly believed that she had a physical impairment that substantially limited one or more major life activities, or (2) mistakenly believed that an actual, nonlimiting impairment substantially limited one or more of her major life activities.  See Sutton, 527 U.S. at 489.

To establish that Amtrak ran afoul of the ADA when it terminated her employment on the basis of a perceived disability, see id. at 490, plaintiff asserts that Porter was aware that she "used a special chair for her back, walked with a limp, could not stand or walk for long periods of time, and regularly attended physical therapy sessions . . .."  (Pl.'s Opp'n at 43.) Plaintiff further asserts that Porter regarded her as disabled because she informed Porter in December 1999 that she needed surgery.  (See Pl.'s Am. Compl. ¶ 15; Pl.'s Opp'n at 42, 43.)

It is undisputed that, "at various times, [Porter and plaintiff] talked about [their] back problems."  (Walfoort Decl., Ex. 6 at 233).  It is also undisputed that Porter "was aware that [plaintiff] periodically had pains" and knew that Amtrak provided her with an oversized chair.  (Id. at 233-234.)  Yet that is the only evidence -- other than her own conclusory statements -- that plaintiff advances to demonstrate that Amtrak regarded her as

being disabled.[33]  She does not allege, nor does she present any

evidence, that she provided Porter or Amtrak with any medical

records or informed Porter or the company that she considered

herself disabled within the meaning of the ADA.[34]  Nor does she

present evidence that anyone at Amtrak mistakenly believed either

that she had a physical impairment that substantially limited any

major life activity, or that an actual nonlimiting impairment she

had substantially limited a major life activity.  Porter's

admitted knowledge of plaintiff's back problems and Amtrak having

provided plaintiff with an oversized chair does not, without

more, establish that she or any other Amtrak employee perceived

plaintiff as disabled within the meaning of the ADA.  See, e.g.,

_____

[33]     A plaintiff's bare conclusory assertions are
insufficient to support her burden of establishing a *prima facie*
case of perceived disability discrimination under the ADA.  See
Harding v. Gray, 9 F.3d 150, 154 (D.C. Cir. 1993); Sage v.
Broadway Publ'ns, Inc., 997 F. Supp. 49, 53 (D.D.C. 1998); McCain
v. CCA of Tenn., Inc., 254 F. Supp. 2d 115, 119 (D.D.C. 2003).

[34]     Plaintiff offers no objective evidence -- such as
medical records or deposition testimony from her doctor or former
Amtrak co-workers -- to support her claims that she was diagnosed
with degenerative arthritis in June 1999, could stand or walk
only for short periods of time, attended therapy sessions while
an Amtrak employee, or walked with a limp.  Nor does she present
any evidence to support her assertion that her doctor recommended
surgery in December 1999.  The only medical evidence in the
record perhaps shows that plaintiff's doctor, Dr. Emad Zeitouneh,
discussed with her "degenerative changes" in her physical
condition on December 10, 1999 (see Ford Decl., Ex. 25), and
recommended physical therapy on May 24, 2000 (see id.), but none
of the medical records even mention surgery as a possibility.

Haulbrook v. Michelin N. Am., 252 F.3d 696, 703 (4th Cir. 2001)
(holding that an employer's awareness of an employee's
impairment, without more, is insufficient to demonstrate that the
employer regarded the employee as disabled); Kellogg v. Union
Pac. R.R. Co., 233 F.3d 1083, 1089 (8th Cir. 2000) (same); Reeves
v. Johnson Controls World Servs., Inc., 140 F.3d 144, 153 (2d
Cir. 1998) (same); Kelly v. Drexel Univ., 94 F.3d 102, 109 (3d
Cir. 1996) (same); Simonson v. Trinity Reg'l Health Sys., 336
F.3d 706, 709 (8th Cir. 2003) (holding that an employer's
awareness of "[plaintiff's] past medical problems does not
establish that it regarded her as disabled"); Benoit v. Technical
Mfg. Corp., 331 F.3d 166, 176 (1st Cir. 2003) (holding that
plaintiff's complaint of back pains and request for "simple
stands to assist with lifting" made to his employer were
insufficient to establish that the employer regarded him as
disabled because "he at no point indicated to [the employer] that
he was disabled within the meaning of the ADA"); Thorton v.
McClatchy Newspapers, Inc., 261 F.3d 789, 798 (9th Cir. 2001)
(holding that when an employer takes steps to accommodate an
employee's restrictions, it is not thereby conceding that the
employee is disabled under the ADA or that it regards the
employee as disabled).

Because plaintiff has not made out a *prima facie* case that Amtrak terminated her employment in January 2000 on the basis of a perceived disability in violation of the ADA, Amtrak's motion for summary judgment on plaintiff's claim that she was terminated based upon a perceived disability in Count IV will be granted.

###    D.   DCHRA

Green and Porter claim that they cannot be held individually liable under the DCHRA.  The DCHRA states, with regard to race, age, gender and disability discrimination:

> It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon the race, . . . sex, age, . . . [or] disability ... of any individual:
>      1) *By an employer*. - To fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment . . . .

D.C. Code Ann. § 2-1402.11(a)(1) (emphasis in original). District of Columbia and federal courts often rely upon decisions of the federal courts in Title VII, § 1981, ADEA, and ADA cases to aid in construing the DCHRA.  See Chang v. Inst. for Pub.-Private P'ships, Inc., 846 A.2d 318, 324 (D.C. 2004) (ADA); Lively v. Flexible Packaging Ass'n, 830 A.2d 874, 887-88 (D.C. 2003) (Title VII); McManus v. MCI Communications Corp., 748 A.2d 949, 956 n.7 (D.C. 2000) (ADEA); Daka, Inc. v. Breiner, 711 A.2d

86, 94 (D.C. 1998) (Title VII); <u>Villines v. United Bhd. of</u>
<u>Carpenters & Joiners of Am., AFL-CIO</u>, 999 F. Supp. 97, 102 n.21
(D.D.C. 1998) (§ 1981); <u>Carney v. Am. Univ.</u>, 960 F. Supp. 436,
449 (D.D.C. 1997) (§ 1981), <u>aff'd in part, rev'd in part on other</u>
<u>grounds</u>, 151 F.3d 1090 (D.C. Cir. 1998).  For example, the
District of Columbia Court of Appeals in DCHRA cases has adopted
"'the same three-part, burden-shifting test articulated by the
Supreme Court for Title VII cases in <u>McDonnell Douglas Corp. v.</u>
<u>Green</u>, 411 U.S. 792, 802 (1973)[,]'" <u>Futrell v. Dep't of Labor</u>
<u>Fed. Credit Union</u>, 816 A.2d 793, 802 (D.C. 2003) (age and race
claims) (quoting <u>Hollins v. Fed. Nat'l Mortgage Ass'n</u>, 760 A.2d
563, 571 (D.C. 2000)); <u>RAP, Inc. v. D.C. Comm'n on Human Rights</u>,
485 A.2d 173, 176-77 (D.C. 1984) (sex claim); followed federal
cases in recognizing a cause of action for an age-based hostile
work environment claim, <u>Daka, Inc.</u>, 711 A.2d at 95; adopted
federal elements of a sexual harassment claim, <u>Howard Univ. v.</u>
<u>Best</u>, 484 A.2d 958, 978 (D.C. 1984); and followed federal Title
VII precedent to enforce an agreement to arbitrate employment
discrimination claims.  <u>Benefits Communication Corp. v.</u>
<u>Klieforth</u>, 642 A.2d 1299, 1304 (D.C. 1994).

The District of Columbia Court of Appeals has consistently
said, however, that it would adopt in DCHRA cases federal civil
rigths precedents "when appropriate," not indiscriminately.

- 58 -

Wallace v. Skadden, Arps, Slate, Meagher & Flom, 715 A.2d 873,
889 n.31 (D.C. 1998) (quoting Klieforth, 642 A.2d at 1301); see
also Arthur Young & Co. v. Sutherland, 631 A.2d 354, 371-72 (D.C.
1993) (permitting, given the text of the DCHRA and its
legislative history, punitive damages awards despite their
unavailability under Title VII, and noting that "Title VII is not
the only source of the DCHRA").  And in Wallace, the court held
that although individual employees cannot be held liable under
Title VII, the text and history of the DCHRA suggest no similar
bar.

      The DCHRA's definition of employer is broader than Title
VII's and includes "any person acting in the interest of such
employer, directly or indirectly."  D.C. Code Ann. §§ 2-
1401.02(10).  The DCHRA also makes it unlawful to aid and abet,
or to attempt, any of the discriminatory acts forbidden by the
statute.  Id. § 2-1402.62.  These textual provisions "find[] no
analogue in the federal statute."  Wallace, 715 A.2d at 889.
Thus, Wallace held that law firm partners alleged to have
participated in unlawful discriminatory conduct could be held
liable individually.  Id.; see also Lance v. United Mine Workers
of Am. 1974 Pension Trust, Civil Action No. 04-746(RCL), 2005 WL
2766073, at *3 (D.D.C. Oct. 26, 2005) (holding individual
defendants subject to suit); MacIntosh v. Bldg. Owners & Managers

Ass'n Int'l, 355 F. Supp. 2d 223, 227-228 (D.D.C. 2005) (holding

plaintiff's supervisor subject to suit).  This result was

unremarkable since the DCHRA, as a remedial statute, "must be

generously construed[,]'" Wallace, 715 A.2d at 889 (quoting

Simpson v. District of Columbia Office of Human Rights, 597 A.2d

392, 398 (D.C. 1991)), and its "primary purpose [was] to

eradicate all employment discrimination[.]"[35]  Daka, 711 A.2d

at 94.  The text and purpose of the DCHRA, and Wallace, do not

suggest that it would be appropriate to follow Title VII here and

preclude a claim against individual management and supervisory

employees involved in committing the allegedly discriminatory

conduct.[36]  Green and Porter, then, are proper defendants in

plaintiff's DCHRA claim.

As is discussed above with respect to her federal

discriminatory termination claims, plaintiff has neither

demonstrated that Amtrak's proffered legitimate and non-

discriminatory justification for her January 2000 termination is

mere pretext for unlawful age discrimination, nor established a

---

[35]   Title VII, by contrast, exempts from its prohibitions a
host of employers.  See 42 U.S.C. § 2000e(b).

[36]   Hunter v. Ark Rests. Corp. held that individuals cannot
be held liable under the DCHRA.  3 F. Supp. 2d 9, 15-17 (D.D.C.
1998).  However, that case was decided before the final Wallace
opinion was published.

*prima facie* case of perceived disability discrimination.[37]

Because Amtrak is entitled to judgment as matter of law under the

<u>McDonnell Douglas</u> burden shifting framework on plaintiff's

termination claims under the ADEA and the ADA, judgment also will

be granted to defendants on her claims in Count V that they

unlawfully discriminated against her on the basis of age and

perceived disability in violation of the DCHRA when the company

terminated her employment in January 2000.  Because plaintiff's

federal claims of race and gender discrimination regarding her

termination survive summary judgment, defendants' motion will be

denied as to plaintiff's corresponding DCHRA claims in Count V.

## II.  THE NEC MANAGER POSITION

### A.  <u>Race and gender discrimination under Title VII and § 1981</u>

With regard to plaintiff's discriminatory failure to hire

claim, Amtrak again does not dispute that plaintiff has

established a *prima facie* case of race and gender discrimination

under Title VII and § 1981.  (<u>See</u> Defs.' Mem. Supp. Summ. J.

---

[37]    Perceived disability causes of action are recognized
under the DCHRA, <u>see</u> <u>Chang</u>, 846 A.2d at 324, and are scrutinized
under the same standards that are enunciated in <u>Sutton</u>.  <u>See</u> <u>id.</u>
(recognizing that "[t]he Supreme Court has held that 'a person is
"regarded as" disabled within the meaning of the ADA if a covered
entity mistakenly believes that the person's actual, nonlimiting
impairment substantially limits one or more major life
activities'") (quoting <u>Murphy v. United Parcel Serv.</u>, 527 U.S.
516, 521-22 (1999) (citing <u>Sutton</u>)).

at 27.)  To rebut plaintiff's *prima facie* case, Amtrak proffers

that the decisionmaker for the NEC Manager position, Rose

Bacchus, did not offer plaintiff the position because she and

Ramirez considered her among the weakest of the interviewees for

the NEC Manager position.  Bacchus testified that interviews were

more important than the candidates' paper credentials in her

determination of whom to hire for the NEC Manager position.

Amtrak thus asserts that because Bacchus and Ramirez ranked

plaintiff at or near the bottom of the candidates following their

interviews, she was not offered the NEC Manager position.

"Selecting a pool of qualified candidates based upon their

written credentials and then making a final selection based upon

personal interviews is an obviously reasonable method of hiring a

professional employee."  Fishbach v. D.C. Dep't of Corr., 86 F.3d

1180, 1183-84 (D.C. Cir. 1996).  Indeed, where, as here, the

candidates meeting the minimum qualifications were pre-chosen for

the interview based on their applications and resumes, "[t]here

is nothing the least bit fishy about the interviewers' giving

slightly less emphasis to the applicant's credentials than to the

manner in which each candidate proposed to do the job . . .."

Id. at 1184.  Amtrak's proffer -- that Bacchus relied on the

results of the interviews for choosing the NEC Manager -- is a

reasonable and nondiscriminatory justification for its business

- 62 -

decision.  See id. at 1182.  Plaintiff must therefore offer
evidence that Amtrak's proffered reason is mere pretext for
unlawful discrimination.

Plaintiff asserts that pretext is established for several
reasons: (1) the job requirements and qualifications listed in
the job posting did not include the characteristics and qualities
Bacchus testified that she was looking for in filling the NEC
Manager position (see Pl.'s Opp'n at 23, 25); (2) Bacchus and
Ramirez provided conflicting testimony regarding whether they
considered race and gender as factors in selecting the NEC,
Intercity and West Manager positions (see id. at 27);
(3) Bacchus's testimony regarding how she selected the NEC
Manager and to whom she offered the job is not supported by the
record (see id. at 26); and (4) Amtrak did not follow its policy
that requires internal applicants to have satisfactorily
performed in their current positions for at least one year before
being eligible for consideration for another Amtrak position.
(See id. at 23, 26.)

### 1.    The NEC Manager job posting

Plaintiff asserts that pretext is established because the
qualifications and characteristics that Bacchus looked for in an
NEC Manager did not comport with the job description and
qualifications set forth in the October 1999 NEC Manager job

posting.  According to the job posting, the NEC Manager was responsible for administering and coordinating company sponsored employee services, often conducting difficult employee counseling sessions regarding salary, promotion, hiring, job classification, performance and termination decisions.  The job posting further required of a candidate creative and effective written, oral presentation and verbal interchange skills, as well as an ability to work well with senior staff.

When asked about the qualifications she was looking for in an NEC Manager, Bacchus testified that it was important for the manager to be able to listen to and communicate with all levels of people in a variety of situations, to know where Amtrak's lines of division occur and to establish professional networks within various parts of the company.  The NEC Manager also needed to be "able to reach out and bring the appropriate people together to expedite things getting done."  (Ford Decl., Ex. 13 at 31.)  Bacchus further believed that the NEC Manager had to have the ability to use discretion, good judgment and maturity in dealing with individual personalities.

Bacchus's testimony is not inconsistent with the job description and qualifications set forth in the job posting.  The NEC Manager job posting indicates that the responsibilities of the manager include addressing employee concerns and counseling

Amtrak management employees in employment practices.  To
accomplish those tasks, the job posting further provides that an
applicant should be well versed in Amtrak policies and
procedures, and be able to manage according to established Amtrak
guidelines and sound administrative practices.  Bacchus's
testimony merely fleshed out the importance of these
responsibilities and qualities to the job for which plaintiff
applied, and did not add additional and hidden qualification
requirements.  Plaintiff's assertion that Bacchus's factors
served as impermissible bases for evaluating her candidacy --
because the NEC job posting did not explicitly indicate that
knowledge of the organization and networking were important to a
candidate's evaluation -- is unavailing.  The job posting and
Bacchus's testimony regarding the NEC Manager position do not
permit an inference of discriminatory motive or demonstrate
pretext.

> **2.  Bacchus's and Ramirez's consideration of race and
> gender**

Plaintiff also argues that pretext is demonstrated because
Bacchus and Ramirez considered the issue of gender and race
diversity during the selection process, therefore providing an
inference that plaintiff's race and gender became disqualifying
factors for the NEC Manager position.  Ramirez testified during

his deposition that he and Bacchus hoped to have a "diverse group" of managers between the NEC, Intercity and West manager positions because "it would help the diversity issue . . . taking into account gender and race and national origin." (Walfoort Decl., Ex. 13 at 124-25.)  Although such a discussion between Ramirez and Bacchus, if it occurred, may have exhibited the lawful goal of achieving workplace diversity through an open and fair application and interview process, it could also suggest that an applicant's race, gender and/or national origin became, as plaintiff posits, a disqualifying characteristic for the NEC Manager position.

Plaintiff does not rely solely on Ramirez's recollection of his discussion with Bacchus on the issue of diversity to challenge Amtrak's proffered explanation for its failure to hire plaintiff for the NEC Manager position.  Plaintiff argues that Bacchus' testimony in her deposition that diversity was not an issue and that the topic never came up in discussions with Ramirez (see id., Ex. 16 at 60), constitutes a material inconsistency which suggests that Bacchus is attempting to gloss over the use of race and gender as disqualifying factors in the NEC Manager selection process.  Plaintiff notes in advancing her pretext argument that on January 7, 2000 -- two weeks before Amtrak notified plaintiff that she had not been selected for the

NEC Manager position -- Amtrak offered the Intercity Manager

position to Janet Harvey and the West Manager position to Carol

Brown.  Harvey and Brown are African-American females.  If

Ramirez's deposition testimony that race and gender were taken

into account when filling the SBU manager positions is credited,

an inference could be drawn that because two African-American

females were selected for the Intercity and West manager

positions before any decision had been made regarding the NEC

Manager position, that Bacchus decided not to hire plaintiff for

the remaining NEC Manager position because she was an African-

American female.  As is discussed below, such an inference could

draw added support from the inconsistent accounts of Amtrak

managers regarding the NEC Manager selection process, and

Amtrak's failure to comply with its own hiring policies.

### 3.  Bacchus's selection process and offering the position to two white male employees

According to Bacchus, she and Ramirez met and discussed the

NEC Manager candidates only "[a]t the end of all of [the

interviews]."[38]  (Ford Decl., Ex. 13 at 65.)  She testified that

-----

[38]  Plaintiff suggests that Bacchus and Ramirez treated her
unfairly and differently during the interview process "based on
the fact that the interview was very, very different from the
behavioral based interviewing that [plaintiff] had done
throughout [Amtrak] for senior managers[.]"  (Ford Decl., Ex. 5
at 199.)  "An employer's failure 'to follow its own regulations
and procedures, alone, may not be sufficient to support' the
conclusion that its explanation for the challenged employment

during that meeting, she and Ramirez discussed her impressions of
each candidate and what her intentions were with respect to
making a job offer (see id. at 67), and that Ramirez "certainly
did not have an objection with [her] choice for selection." (Id.
at 68.)  Bacchus's testimony that she would have to approve any
job offer for the NEC Manager position (see id. at 75), and that
only one candidate, Barry Warner, received an offer for the
position (see id. at 74), evinces a belief on her part that she
met with Ramirez only once, which by necessity would have had to
occur sometime after February 11, 2000 when she and Ramirez
interviewed the last candidate -- Warner.  (See Ford Decl.,
Ex. 15.)

    Amtrak denied plaintiff the NEC Manager position on
January 21, 2000 (see Ford Decl., Ex. 16), at least three weeks
before Bacchus and Ramirez could have met, under Bacchus's
timeline, to discuss all of the candidates to make a selection.[39]

_____

action is pretextual." Fishbach, 86 F.3d at 1183 (quoting
Johnson v. Lehman, 679 F.2d 918, 922 (D.C. Cir. 1982)).
Plaintiff neither offers comparative evidence to support her
allegation that the NEC Manager position interview process
deviated from some company-wide standard, nor refutes Bacchus's
testimony that she and Ramirez followed the same form and asked
the same questions of each candidate.  Plaintiff's unsupported
allegation of unfair treatment due to the type of interview
conducted does not support an inference of discriminatory motive.

    [39]   There is some evidence that Ramirez and Bacchus may
have met at some point before sending plaintiff the January 21,
2000 letter denying her the NEC Manager position.  Ramirez

- 68 -

Further, Ramirez sent a letter to Robert Dougherty on

February 18, 2000 which expressed regret that Dougherty was

unable to accept an offer for the NEC Manager position.  (See

Walfoort Decl., Ex. 34.)  Ramirez's letter strongly implies,

contrary to Bacchus's testimony that only Warner received an

offer, that there was an attempt to fill the position with at

least one other white male candidate.  This inconsistency could

lead to an inference that plaintiff's race and gender were

disqualifying factors in her attempt to obtain the NEC Manager

position because Bacchus did not want to fill the last SBU

manager position with another African-American female.[40]

─────────────────

testified during his deposition that he discussed with Bacchus
the fact that plaintiff had been terminated from her HR
Consultant position on January 7, 2000 (see Walfoort Decl., Ex.
13 at 34), and that he thought it would be a favor to plaintiff
to notify her that she had not been selected for the position.
(See id.)  Ramirez's testimony is at odds with Bacchus's
recollection regarding the timing of any discussions regarding
any of the candidates.  When asked during her deposition to
confirm her testimony that her discussions with Ramirez occurred
after all of the interviews and been completed, Bacchus replied,
"[o]h yes.  Not after each one."  (Ford Decl., Ex. 13 at 65).
Such an additional inconsistency could produce a credibility
issue for a jury to resolve.  Further, although there may be an
innocent explanation for the repeated inconsistencies -- such as
Bacchus's simple failure to recollect the details and timing of
her interactions with Ramirez regarding the NEC Manager position
-- Amtrak has not offered any such explanation for the material
inconsistencies.

[40]    It is also undisputed that before Dougherty and Warner
were interviewed, three of the other four candidates interviewed
by Bacchus and Ramirez included an African-American male Amtrak
employee and two African-American female Amtrak employees (see

### 4.   Amtrak's failure to adhere to its hiring policy

Plaintiff also argues that pretext is established because Amtrak did not follow its established policies and procedures with respect to management position applications in filling the NEC Manager position.  Amtrak's policy for applying for posted management positions states that "[a] management employee may not apply for a posted management position if he or she has not been in his or her current position for at least one year."  (Ford Decl., Ex. 48.)  "However, if these restrictions create a hardship for Amtrak, the employee's supervisor AND the Personnel Department may grant an exception to this rule."  (Id.) (emphasis in original.)  According to Ramirez, this one-year policy is fairly consistently followed, and the exception is applied when an "individual's qualifications are . . . so premiere or so eminent that it would be a loss if [Amtrak] didn't move the person into the position or promote the person into a position."  (Walfoort Decl., Ex. 13 at 65.)  Ramirez testified that the decision to grant an exception is made in writing by the corporate vice-president of human resources.  (See id.)

---

Ford Decl., Ex. 15), all of whom were chosen as meeting minimum qualifications for the NEC Manager position before being interviewed.  None of them received an offer for the position.  A white female applicant withdrew her application after interviewing for the position (see id., Ex. 13 at 48), and thus was not considered by Bacchus.

- 70 -

Amtrak admits that Warner had been in his earlier position
for less than one year at the time he applied for and Amtrak
ultimately transferred him into the NEC Manager position (see
Defs.' Reply at 19), but suggest that Warner's supervisor granted
him an exception to the one-year policy.  (See Ford Decl.,
Ex. 49.)  However, Amtrak does not also present evidence that the
then-corporate vice-president of human resources, Lorraine Green,
also granted such an exception in writing.  Nor does Amtrak
establish that Bacchus and Ramirez considered Warner's
qualifications to be "so premiere or so eminent" as to warrant
the application of the exception.  This gap in proof, in
conjunction with the record evidence discussed above which could
lead to an inference that Bacchus and Ramirez considered
plaintiff's race and gender to be a disqualifying factor for the
NEC Manager position, creates a genuine issue of material fact as
to whether, in hiring Warner, Bacchus sought to fill the NEC
Manager position with a white male applicant without regard to,
and in contravention of, Amtrak hiring policy.

Viewing the record in the light most favorable to plaintiff,
genuine issues of material fact exist regarding the role race and
gender played in Bacchus's decision not to offer plaintiff the
NEC Manager position.  A reasonable jury could determine that the
inconsistencies between Bacchus's testimony and other record

evidence demonstrate that Amtrak's proffered legitimate and non-discriminatory justification for not hiring plaintiff for the NEC Manager position is mere pretext for unlawful race and gender discrimination in violation of Title VII and § 1981.  Amtrak's motion for summary judgment on plaintiff's claim of race and gender discrimination for failure to hire her in Counts I and III therefore will be denied.[41]

----

[41]     Plaintiff's claims of race discrimination against Green and Porter with regard to Bacchus's failure to hire her for the NEC Manager position are not supported by any evidence. Plaintiff's apparent bases for alleging § 1981 racial discrimination claim against Green is that Green was Vice-President of Human Resources and therefore "would certainly be aware of the organizational structure within her department, the races . . . of those persons that were being hired, and as a result of that knowledge, she would be discriminatory in her actions."  (Ford Decl., Ex. 5 at 149.)  There is no evidence in the record that demonstrates Green was involved in, let alone aware of, any aspects of the NEC Manager hiring process.  Indeed, Bacchus testified that she was the decisionmaker and needed only approval from her supervisor Gerri Hall, which Bacchus characterized as just "a formality."  (Walfoort Decl., Ex. 16 at 71-72.)  Moreover, plaintiff offers no evidence that Porter had any role in the decision not to offer plaintiff the NEC Manager position, and concedes that she had no reason for naming Porter as a defendant with respect to her discriminatory failure to hire claims.  (See Ford Decl., Ex. 5 at 204 (plaintiff's testimony that she "would not accuse [Porter] of being personally responsible for not giving [her] that [NEC Manager] job").)  Thus, although plaintiff can maintain § 1981 and DCHRA claims against individual defendants (compare Defs.' Mot. to Dismiss at 4-12, with Pl.'s Opp'n Mot. to Dismiss at 4-10), she has no bases for doing so here.  Summary judgment therefore will be granted to Green and Porter with respect to plaintiff's claims of a discriminatory failure to hire her in Counts I and V of her amended complaint.

- 72 -

**B.    Age discrimination under the ADEA**

Plaintiff alleges in Count II that Amtrak denied her the NEC Manager position because of her age in violation of the ADEA. "To establish a prima facie case under the ADEA, for a claim involving a failure to hire, the plaintiff must demonstrate that (1) she is a member of the protected class (i.e., over 40 years of age); (2) she was qualified for the position for which she applied; (3) she was not hired; and (4) she was disadvantaged in favor of a younger person." Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1155 (D.C. Cir. 2004).  Plaintiff has demonstrated a prima facie case here.  She was over 40 at the time she was not hired for the NEC Manager position, she applied for the position and met its minimum qualifications, she was not hired, and she was disadvantaged when Amtrak hired Warner instead of her into the position.

Plaintiff still must offer proof that Amtrak's nondiscriminatory explanation that plaintiff was not offered the NEC Manager position because of her weak interview was mere pretext for unlawful age discrimination.  See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  There is, however, an absence of any evidence that age was a factor considered by Bacchus and Ramirez in the interview and selection process for the NEC Manager position.  Indeed, plaintiff admits

that there is "no evidence to show that Bacchus was aware of the
personnel records that reflected" plaintiff's birth date (see
Pl.'s Opp'n at 37 (emphasis in original)), and Bacchus testified
that she did not know and did not care what plaintiff's age was
at the time she interviewed plaintiff for the NEC Manager
position.  (See Ford Decl., Ex. 13 at 74.)  Bacchus explained
that she "didn't know [plaintiff] very well," so "[t]here was no
need for [her] to think about [plaintiff's age]."  (Id.)  Because
plaintiff has failed to rebut Amtrak's age-neutral justification
with facts from which a reasonable jury could conclude that
plaintiff has sustained her ultimate burden of proving
intentional age discrimination, Amtrak's motion for summary
judgment on plaintiff's claim of age discrimination for failure
to hire her in Count III therefore will be granted.

**C.    Perceived disability under the ADA**

In Count IV, plaintiff alleges that Amtrak discriminated
against her on the basis of a perceived disability when Bacchus
denied her the NEC Manager position.  (See Pl.'s Am. Compl.
¶ 38.)  Plaintiff appears to have abandoned this claim since she
did not respond to Amtrak's argument that "Bacchus was not aware
of any of plaintiff's alleged physical problems."  (Compare
Defs.' Mem. Supp. Summ. J. at 25-26, with Pl.'s Opp'n at 38-45.)
Indeed, it is undisputed that when plaintiff interviewed with

Bacchus and Ramirez for the NEC Manager position, plaintiff did
not appear to have any physical problems (see Ford Decl., Ex. 13
at 78), and plaintiff did not indicate that she would have any
problems with travel or fulfilling the NEC Manager job
requirements.  (See id. at 77.)  Because plaintiff cannot
demonstrate a *prima facie* case that Bacchus or Ramirez regarded
her as disabled, or more importantly, that Bacchus rejected her
application on the basis of a perceived disability, Amtrak is
entitled to judgment as a matter of law on this claim.

>    **D.   DCHRA**

As is discussed above, the sufficiency of claims brought
under the DCHRA is consistently tested using the analytical
framework announced in federal court decisions under federal
anti-discrimination statutes.  Accordingly, because plaintiff has
presented enough evidence to create a genuine issue of material
fact with respect to her claims of race and gender discrimination
for failure to hire her in Counts I and III, she also has
presented enough evidence to withstand summary judgment with
respect to her claims of race and gender discrimination for
failure to hire her under the DCHRA in Count V.  To the extent
plaintiff's complaint seeks to raise age and perceived disability
discrimination for failure to hire claims under the DCHRA, she
has failed to carry her burden of producing evidence to support

those claims.  Amtrak's motion for summary judgment therefore

will be denied with regard to plaintiff's claims of race and

gender discrimination for failure to hire her in Count V, and

will be granted with respect to plaintiff's claims of age and

perceived disability discrimination for failure to hire her in

Count V.

### CONCLUSION AND ORDER

Title VII provides no cause of action against individual

employees.  To the extent plaintiff's complaint asserts a Title

VII claim against Green and Porter, their motion to dismiss the

claim as to them will be granted.  Since Green and Porter played

no role in Amtrak's decision to not hire plaintiff as the NEC

manager, Green and Porter's motion for summary judgment will be

granted as to all claims against them in Counts I and V regarding

the failure to hire.  Plaintiff has placed sufficient material

facts in dispute with regard to her Title VII, § 1981 and the

DCHRA claims of suffering race and gender discrimination when

Amtrak terminated her and later failed to hire her for the NEC

position.  Amtrak's motion for summary judgment will be denied

with respect to plaintiff's claims of race and gender

discrimination in Counts I, III and V, as will Green and Porter's

with respect plaintiff's claim of discrimination in termination

on the ground of race under § 1981 in Count I and on the grounds

of race and gender in Count V.  Plaintiff has not placed any material issues in dispute with respect to her claims of age and perceived disability discrimination when she was terminated and not re-hired.  Summary judgment will be granted to Amtrak on Counts II and IV, and to all defendants on plaintiff's age and perceived disability claims alleged in Count V.  Accordingly, it is hereby

ORDERED that Green's and Porter's motion [#16] to dismiss Counts I and V under Federal Rule of Civil Procedure 12(c) be, and hereby is, GRANTED in part and DENIED in part.  To the extent Count I asserts a Title VII cause of action against Green and Porter, that cause of action is dismissed.  The motion is otherwise denied.  It is further

ORDERED that defendants' motion for summary judgment [#55] be, and hereby is, GRANTED in part and DENIED in part.  Amtrak's motion is GRANTED with respect to Counts II, IV and the age and perceived disability discrimination claims in Count V; and DENIED with respect to Counts I and III and the claims of race and gender discrimination in Count V.  Green and Porter's motion for summary judgment is DENIED with respect to the § 1981 termination claim in Count I and the claims of race and gender discrimination in termination in Count V; and GRANTED with respect to the age

- 77 -

and perceived disability discrimination in termination claims in

Count V, and the failure to hire claims of Counts I and V.

SIGNED this 30th day of December, 2005.

_____/s/_____
RICHARD W. ROBERTS
United States District Judge